DONICH ET AL., APPELLANTS, *v.* JOHNSON ET AL., RESPONDENTS.

(No. 5,936.)

(Submitted September 16, 1926.   Decided October 25, 1926.)

[250 Pac. 963.]

*Waters and Water Rights—Construction of Reservoirs at Headwaters of Stream—Rights and Duties of Appropriators of Reservoired Water — Statutes — Constitution — Pleadings— When Deemed Amended to Conform to Proof.*

Waters and Water Rights—Construction. of Reservoirs—Public Use—
Constitutional Provision—Construction.
  1. The constitutional provision (Art. III, sec. 15) declaring, among other things, that the use of sites for reservoirs necessary for collecting and storing water shall be a public one, should receive a broad construction to the end that flood waters which would otherwise go to waste may be conserved for the purpose of making the arid lands of the state productive.

Same—Construction of Reservoirs at Headwaters of Streams Authorized.
  2. *Held*, that. under sections 2658–2671 of the Revised Codes of 1921, reservoirs may be constructed for the purpose of storing flood waters, in the course or at the headquarters of an adjudicated stream, provided their construction does not interfere with the use by prior appropriators of the natural flow in the stream to the extent of their appropriations.

Same—Extent of Right of Appropriator.
  3. Where the rights of an appropriator of water have been adjudicated, the amount awarded him by the decree is the amount

---

2.  See 27 R. C. L. 1101.

of his appropriation; so long as that amount is permitted to flow to his headgates he is in in no position to complain.

Same—Construction of Reservoir—Reservoir Appropriation—Burden of Proof on Appropriator to Show, What.

4. In a water right suit between a prior appropriator and an appropriator of water stored by him in a reservoir, the burden is upon the latter to show that by his construction, maintenance and use of the reservoir he did not interfere with the rights of prior appropriators of water from the stream in the course of which it was constructed.

Same—When Reservoir Right to be Denied.

5. Where it is made apparent that the construction and maintenance of a dam in the course of a stream will necessarily deprive a prior appropriator of water he is entitled to, the right to maintain and operate the reservoir should be denied.

Same—Appropriations from Adjudicated Streams—Statutes—Construction.

6. Held, that Chapter 185, Laws of 1907, regulating the method by which appropriations of water from adjudicated streams could be made, was not, but that Chapter 228, Laws of 1921, amendatory thereof, is exclusive.

Same—Reservoir Appropriations—Evaporation—Method of Computing.

7. In computing the amount of evaporation for which an appropriator of water from a reservoir constructed by him at the outlet of a lake the waters of which discharge into a stream, must account to the prior appropriators of all the waters of a stream, the acreage of the lake in its natural state must be deducted.

Same—Natural Flow of Stream—How Determinable, Where · Inflow into Reservoir Ascertainable.

8. Where the inflow into a reservoired lake may be ascertained with reasonable certainty, the decree in a suit of the nature of the above should provide for the placing of a suitable measuring device at the inlet and outlet to enable the release of the natural flow of the lake into the channel of the stream whenever prior appropriators of the waters of the stream into which the lake waters are discharged need it, and stored water should be permitted to run into the channel, plus a reasonable amount for seepage and evaporation.

Same—Method of Determining Natural Flow Where Inflow into Reservoir not Readily Measurable.

9. Where it is not feasible to measure the inflow into a reservoired lake, a proper method for determining the amount of water the reservoir owner must release, is to measure the natural flow from the lake which amount he must release at all times when required by prior appropriators, and when he opens the reservoir for use he must release that amount in addition to the stored water he releases under his reservoir appropriation.

Same—Reservoirs—Duty of Reservoir Appropriator.

10. Where because of unfavorable weather conditions flood waters are insufficient to fill a reservoir, the reservoir owner can claim only the water actually impounded during the winter months, and must release the natural flow from the lake when called upon to do so by prior appropriators.

5. See 27 R. C. L. 1194.

[77 Mont. 229.]

Same—Expense Properly Chargeable to Reservoir Claimants.
11.  Under the facts of this case, where parties constructed reservoirs at the headwaters or in the course of a stream the waters of which were adjudicated and asserted a right to appropriate and use the water thus stored, they were required to bear the expense incident to the appointment of a water commissioner, the installation of a telephone system, etc., necessary to a proper distribution of the water between the prior and revervoir appropriators.

Appeal—When Pleadings Deemed Amended to Conform to Proof.
12.  Where evidence was admitted without objection under insufficient pleadings, they will on appeal be considered amended to conform therewith.

Waters and Water Rights—Reservoirs—Repairs on Dam—What Does not Amount to Enlargement of Dam.
13.  If repairs on a dam for the reservoiring of water, no matter how substantial, do not have the effect of making the reservoir hold more water than its owners originally contemplated the principle that each enlargement of a reservoir amounts to a new appropriation does not apply.

[1]  Waters, 40 Cyc., p. 705, n. 19; p. 717, n. 98 New.
[2]  Waters, 40 Cyc., p. 717, n. 98 New.
[3]  Waters, 40 Cyc., p. 718, n. 7 New.
[4]  Waters, 40 Cyc., p. 709, n. 41 New; p. 733, n. 26 New.
[5]  Waters, 40 Cyc., p. 724, n. 37.
[6]  Waters, 40 Cyc., p. 712, n. 69, 70; p. 713, n. 72; p. 721, n. 24; p. 722, n. 25; p. 725, n. 43.
[7]  Waters, 40 Cyc., p. 714, n. 84.
[8]  Waters, 40 Cyc., p. 717, n. 98 New; p. 737, n. 61 New.
[9]  Evidence, 23 C. J., sec. 1964, p. 141, n. 2 New.  Waters, 40 Cyc., p. 717, n. 98 New.
[10]  Waters, 40 Cyc., p. 717, n. 98 New; p. 734, n. 32.
[11]  Waters, 40 Cyc., p. 717, n. 98 New.
[12]  Appeal and Error, 4 C. J., sec. 2683, p. 750, n. 92.  Waters, 40 Cyc., p. 734, n. 31.
[13]  Waters, 40 Cyc., p. 711, n. 62 New.

*Appeal from District Court, Powell County; George B. Winston, Judge.*

ACTION by George Donich and others against G. W. Johnson and others.  Judgment for defendants, and plaintiffs appeal.  Remanded, with directions.

*Mr. W. E. Keeley,* for Appellants, submitted a brief, and argued the cause orally.

Is the water flowing from the lakes in question at all times of the year, whether impounded water or not, such a part of the

12.  See 2 R. C. L. 77.

natural flow during the irrigation season that the creek rights are entitled to take it regardless of any rights of those making an increased or additional flow possible? If this question is answered in the affirmative, it means that there is no such thing as a reservoir right in a flowing stream in Montana, unless all creek rights are fully supplied before the reservoir owner attempts to use any water upon his own land. The appellants have disclaimed any right to the normal flow during any time it is needed for irrigation. They have permitted the natural flow to go down the creek in addition to released impounded water. In recapture, they have made liberal allowance for seepage, evaporation and other losses. What more could they do? It is entirely evident that the learned and esteemed judge of the lower court cannot conceive of any kind of a valid reservoir right. His decision in this case is identical with his holding in the case of *Kelly* v. *Granite Bi-Metallic Co.*, which was reversed in 41 Mont. 1, 108 Pac. 785. If his decision in the case at bar is correct, then the decision of this court in the *Kelly Case* was wrong, and reservoir rights are not recognized in Montana.

Flood waters may be appropriated, turned into a stream, and reclaimed. (Secs. 7093 and 7096, Rev. Codes 1921; *Jeffers* v. *Montana Power Co.*, 68 Mont. 114, 217 Pac. 652.) Where a person increases the natural flow of a stream he has the right to the excess. (*Beaverhead Canal Co.* v. *Dillon Electric Co.*, 34 Mont. 135, 85 Pac. 880; *Smith* v. *Duff*, 39 Mont. 382, 133 Am. St. Rep. 587, 102 Pac. 984; *Spaulding* v. *Stone*, 46 Mont. 483, 129 Pac. 327; *State* v. *District Court*, 56 Mont. 578, 185 Pac. 1112.) All that a creek user is entitled to receive, as against a reservoir user, is sufficient water at the head of his ditch from the normal and natural flow of the creek to supply his water rights when needed. (*Kelly* v. *Bi-Metallic Co.*, supra; *Featherman* v. *Hennessy*, 41 Mont. 535, 113 Pac. 751.) Where an artificial increase in the stream is shown, the court should determine the amount of such increase "as definitely

as possible" and award it.  (*Reno* v. *Richards*, 32 Idaho, 1, 178 Pac. 81.)

If the statutes of 1907 (Chap. 185, Laws of 1907), and 1921 (Chap. 229, Laws of 1921), pertaining to the appropriation of water from an adjudicated stream are applicable to any of the reservoir rights of appellants, such statutes are unconstitutional and void as depriving such appellants of their day in court and due process of law.  The 1907 statute clearly contravenes the due process of law requirement.  Section 4872 of the Revised Codes of 1907 provided only for the publication of a notice in a newspaper for three weeks "giving the name of the appropriator, amount of appropriation, and name of stream from which the water is appropriated."  Any person interested had to file written objections "on or before the last day of publication."  Under section 4873, this was supposed to give the court jurisdiction to enter what amounted to a formal decree.  No service of process of any kind was required to be made upon any of the other water users, decreed or undecreed.  I submit that had the appellants complied, or had attempted to comply, with these 1907 statutes, their acts in that respect would have been nullities.  And the law does not require the doing of a useless thing.  (2 Wiel on Water Rights, 3d ed., pp. 1124, 1125.)  While the 1921 statute provides for personal service of process, and therefore is not open to some of the objections made against the 1907 statute, yet we contend that they are both void and unconstitutional as depriving appellants of their day in court and of due process of law. (1 Wiel on Water Rights, 3d ed., pp. 625, 626, 681; *Mays* v. *District Court*, 34 Idaho, 200, 200 Pac. 115; *Harvey* v. *Deseret Sheep Co.*, 40 Idaho, 450, 234 Pac. 146; *Inman* v. *Round Valley Irr. Co.*, 41 Idaho, 482, 238 Pac. 1018.)

*Mr. W. J. Paul* and *Mr. S. P. Wilson,* for Respondents, submitted a brief, and argued the cause orally.

The complaint in this action fails to state a cause of action for the reason, *inter alia,* that it alleges no right and no

appropriation of water authorized or permitted by the laws of this state. Unquestionably, it is the law of this state that the water of a lake is the subject of appropriation; however, in appropriating the water of a lake the appropriator is bound by the same rules as if he were appropriating the water of a stream, that is, he must appropriate a definite portion of the body of the water and for a beneficial purpose, and as between him and other appropriators the rule of "first in time is first in right" applies where the lake is only an enlarged portion of the stream; then, of course, prior appropriators upon the stream have the prior right to the water of the lake which is the source of the stream. Merely increasing the volume of the lake by retarding the very water which should go to the prior appropriators lacks much of constituting an appropriation. It is also well established that where one increases the natural flow of a stream, by water brought from an independent source, he may reclaim such water. It is under these well-established rules that appellants seek rights in this case The question confronting the court is whether or not appellants have brought themselves within these well-established rules. Respondents earnestly urge that they have not. The cases in this state discussing the question of the storage of water and the increasing of the natural flow by a junior appropriator are: *Beaverhead Canal Co.* v. *Dillon Electric L. & P. Co.,* 34 Mont. 135, 85 Pac. 880; *Spaulding* v. *Stone,* 46 Mont. 483, 129 Pac. 327; *Smith* v. *Duff,* 39 Mont. 382, 133 Am. St. Rep. 587, 102 Pac. 984; *State ex rel. Zosel* v. *District Court,* 56 Mont. 578, 185 Pac. 1112; *Bailey* v. *Tintinger,* 45 Mont. 154, 122 Pac. 575. The rule in this state, as announced by this court, in the foregoing cases, does not permit a junior claimant to make claim to any part of the water that would naturally flow in an adjudicated stream as an increase of the natural flow. To make such claim the water must come from an independent source and it must be water that would not otherwise naturally flow in the stream in question. Appel-

lants in this action in attempting to make their various appropriations pretend to do nothing but retard the flow of water wholly appropriated by prior appropriators in the stream itself, thereby lessening the natural flow of the stream one month and then releasing that retarded flow another month, thus increasing upon the latter occasion the amount of water.

Courts of equity have full jurisdiction to determine all matters presented, and we assume that the district court in 1890 awarded the appropriated water of Race Track Creek in its entirety to the thirty-five users, and the plaintiffs admit, as above mentioned, that this award of over six thousand miners' inches is not sufficient to cover the needs and supply the amounts awarded to the irrigators of Race Track Creek. Therefore, during the irrigating season from April until November, there is no unappropriated water in Race Track Creek. The plaintiffs knew in 1901 that this decree was there, and that there was not water flowing in Race Track Creek sufficient to supply the needs of the claimants under this decree. Before they could initiate a water right, a judicial determination that there was a surplus available for the rights or claims of the plaintiffs was necessary. (*Moe* v. *Harger,* 10 Idaho, 194, 302, 77 Pac. 645; *Josslyn* v. *Daly,* 15 Idaho, 137, 96 Pac. 568; *Smith* v. *Duff,* 39 Mont. 382, 133 Am. St. Rep. 587, 102 Pac. 984; *Comstock* v. *Ramsey,* 55 Colo. 244, 133 Pac. 1107.)

To state our position concisely: We urge that when a court of equity in Montana made an adjudication of the waters of a stream the court awarded all of the surplus, waste, seepage and return water to the users under the decree; that all of these waters were and are considered a part of the flow; that after such decree, the legal presumption exists and continues that there is no unappropriated water in such stream; that in order to overcome this legal presumption a claimant must, before the 1907 statute, come into the court having jurisdiction of the stream and by "clear and convincing" proof overcome *this* presumption; after the 1907 enactment the claimant

must conform to the provisions of the statute; that after an adjudication he could no longer help himself and thereby initiate a right except by adverse user.

We will now direct our attention to the claimed appropriations of plaintiffs with reference to the statutes of 1907 and 1921. Both of these statutes have reference to the appropriation of water from an adjudicated stream. The reasons for the enactment of the 1921 statute and the 1907 statute must be identical. There is no different set of circumstances. calling forth the 1907 Act from that which called forth the 1921 Act. The 1921 Act goes more into detail with reference to the method of the appropriation from an adjudicated stream, but, regardless of detail, the causes for the enactment of the law are the same. The supreme court has already declared the 1921 Act exclusive. (*Anaconda Nat. Bank* v. *Johnson,* 75 Mont. 401, 244 Pac. 141.) It would be a queer twist of reasoning that would hold the 1921 Act exclusive and not the 1907 Act, since the object of both Acts is to provide a uniform and exclusive method for a new claimant to appropriate water from an adjudicated stream. The unconstitutionality of these Acts is urged. The only reason suggested why these statutes should be unconstitutional is "no service of process of any kind was required to be made upon any of the water users decreed or undecreed," and while this objection does not lie to the 1921 Act, appellants say that the same is unconstitutional "as depriving appellants of their day in court and of due process of law." Various references to the Act made in Wiel on Water Rights and a decision of the supreme court of Idaho are referred to. However, this court in the case of *Anaconda National Bank* v. *Johnson, supra,* has sustained the constitutionality of these Acts. No suggestion is offered or any reason why the 1907 Act prescribing the method of making a new appropriation upon an adjudicated stream should be any more unconstitutional than the 1921 Act, except that the 1907 Act outlined no comprehensive method of bring-

ing notice to decreed users of the application for the new right. The method provided by the Act was merely a publication of the notice and the Act has been criticised, undoubtedly justly, on that account, not necessarily upon constitutional grounds but upon grounds of public policy. It might happen that the publication would not come to the attention of the decreed owner, or some of them, although they might live in close proximity to where the court is held or the publication made, and thus their opportunity to resist the application, or at least to have an adjudication of the new claim, would be lost entirely without fault on the part of the decreed owner. This, however, was a matter not affecting or at any rate not detrimental to the new appropriator, and hence was not a situation or defect in the statute of which he was entitled to complain. The defect inured rather to his benefit than to his detriment, and the rule is universal that one may not advance the unconstitutionality of a statute unless he is adversely affected by those features of the statute which he claims make the same unconstitutional. (*Hill* v. *Ray,* 52 Mont. 378, Ann. Cas. 1917E, 210, L. R. A. 1917A, 495, 158 Pac. 826; *Barth* v. *Pock,* 51 Mont. 418, 155 Pac. 282; *State* v. *O'Leary,* 43 Mont. 157, 115 Pac. 204; *Potter* v. *Furnish,* 46 Mont. 391, 128 Pac. 542; *Spratt* v. *Helena Power Trans. Co.,* 37 Mont. 60, 94 Pac. 631; *State* v. *Rose,* 40 Mont. 66, 105 Pac. 82.) Furthermore, the constitutionality of a statute will not be held by this court unless the question has been raised in the court below, which was not done. (*Potter* v. *Furnish, supra,* 12 C. J. 785; *State* v. *Hale* (Mo.), 248 S. W. 958; *Taylor Coal Co.* v. *Industrial Commission,* 301 Ill. 548, 134 N. E. 172; 3 C. J. 710.)

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

Race Track Creek, a tributary of the Deer Lodge River, has its source in the mountains on the west side of the Deer Lodge Valley in the counties of Powell, Granite and Deer Lodge.

In these mountains at an elevation of about 7,500 feet lie a number of lakes which discharge their waters directly, or eventually, into Race Track Creek, conceded to be an adjudicated stream in virtue of a decree entered in 1890, which determined that the parties to the suit severally were entitled to quantities of water aggregating not quite 6,300 inches.

The plaintiffs are the owners of lands requiring irrigation, which could be served by Race Track Creek, were the waters of the stream sufficiently copious. Some of them are the owners of decreed rights but these are insufficient for their needs. Conceiving that an ample supply of water might be obtained if the surplus flood and waste waters of the stream were impounded and stored, the plaintiffs at various times have constructed dams at the outlets of the several lakes and by means of the reservoirs thus created have stored water which they have sought to use. Their method of procedure was to close the headgates of the reservoirs in the late fall, releasing the water during the next summer into the channel of Race Track Creek, then diverting water from the channel into their irrigating ditches which run thence to their lands.

The ditches of all the parties to this action are some fourteen or fifteen miles below the lakes.

The ever present need of water in irrigating seasons brought friction between the defendants, all of whom are the owners of decreed rights, and the plaintiffs, over the so-called lake rights, and this lawsuit resulted. The court found for the defendants to the effect that the plaintiffs had not made any appropriations by means of their reservoirs and have no right to impound in or use water from the lakes. From that judgment the plaintiffs have appealed.

Montana has many millions of arid, irrigable lands. With irrigation these, instead of arid would be teeming acres. Experience has shown that lands of this character, now mere grazing lands, with irrigation prove productive to a high degree. Montana also discharges across its borders flood and

surplus waters more than sufficient annually to cover its irrigable lands. When this water is impounded and conserved these vast areas, now fit only for ranging livestock, will ascend to the higher adaptability of supporting contented homes. Every acre of land in this state susceptible to irrigation should be cultivated. (*Allen* v. *Petrick,* 69 Mont. 373, 222 Pac. 451.)

We observed a short time ago that "it is to the interest [1] of the public that water be conserved for use rather than be permitted to go to waste, to the end that the arid lands of the state may be put under irrigation and thus be made productive." (*Anaconda National Bank* v. *Johnson,* 75 Mont. 401, 244 Pac. 141.) Between irrigating seasons the water of Montana's numerous streams mostly goes to waste, and generally speaking, in high-water time, which usually is in June, tremendous quantities of flood waters run away without serving any useful purpose. The construction and maintenance of secure reservoirs for the conservation of these waters, therefore, is of very high public importance. (Kinney on Irrigation & Water Rights, 2d ed., sec. 838.) This the framers of our Constitution recognized in no uncertain terms. Section 15, Article III, of the Constitution provides in part: "The use of all water now appropriated, or that may hereafter be appropriated for sale, rental, distribution, or other beneficial use, and the right of way over the lands of others, for all ditches, drains, flumes, canals and aqueducts, necessarily used in connection therewith, as well as the sites for reservoirs necessary for collecting and storing the same, shall be held to be a public use." The language of this section, as was said in *Spratt* v. *Helena Power Transmission Co.,* 37 Mont. 60, 94 Pac. 631, in the light of our history and natural conditions in a region where the conservation and use of water is all-important to its development and progress, is a mandate from the sovereign people to the courts, and should receive a broad construction. The right to condemn land for a reservoir for the storing of water was declared in *Helena Power Transmission*

*Co.* v. *Spratt,* 35 Mont. 108, 10 Ann. Cas. 1055, 8 L. R. A. (n. s.) **[2]** 567, 88 Pac. 773. The right to impound and store water has been recognized repeatedly in other opinions. (*Kelly* v. *Granite Bi-Metallic C. Min. Co.,* 41 Mont. 1, 108 Pac. 785; *Ryan* v. *Quinlan,* 45 Mont. 521, 124 Pac. 512; *Jeffers* v. *Montana Power Co.,* 68 Mont. 114, 217 Pac. 652; *Anaconda National Bank* v. *Johnson, supra.*) Indeed, the practice of impounding water in reservoirs has obtained in this state from the earliest days. It was essential in placer mining carried on by means of the ground sluice. As early as 1877 the legislature passed an Act concerning dams and reservoirs to the end that public safety might be preserved (Laws 1877, p. 221). This Act, substantially, was carried forward until 1917, when it was amplified somewhat. (Pol. Code 1895, secs. 3440–3453; Rev. Codes 1907, secs. 2138–2151; Chap. 168, 1917 Session Laws, 417.) With the amplification of 1917 it appears in sections 2658–2671, Revised Codes of 1921, and see sections 7117, 7118, *Id.*

Since 1885 it has been the law, if it was not before, that "the water appropriated may be turned into the channel of another stream, or from a reservoir into a stream and mingled with its waters, and then reclaimed; but in reclaiming it, water already appropriated by another shall not be diminished in quantity, nor deteriorated in quality." (Sec. 7096, Rev. Codes 1921.)

While not disposed to question the propositions set forth above counsel for respondents insist that reservoirs should not be permitted in the course of, or at the headwaters of, adjudicated streams. This argument cannot be admitted.

It is true that reservoirs must be constructed and used so **[3]** as not to disturb the rights of prior appropriators. But the utmost prior appropriators may rightfully demand is that he who constructs and uses a reservoir shall not interfere with their use of the natural flow in the creek to the extent of their appropriations. (*Ryan* v. *Quinlan, supra; Anaconda Na-*

*tional Bank* v. *Johnson, supra.*) What is the extent of their appropriations? Manifestly where one's rights have been adjudicated the amount awarded him in the decree must be taken to be the amount of his appropriation, unless he shows an appropriation subsequent to the decree. "The most that the ditch owners are entitled to claim at any time is that the amounts to which they are respectively entitled shall flow to the headgates of their ditches. (*Sayre* v. *Johnson,* 33 Mont. 15, 81 Pac. 389.) They are entitled to nothing more." (*Kelly* v. *Granite Bi-Metallic C. Min. Co., supra.*)

In an action between prior appropriators and a subsequent [4] reservoir user, the burden is cast upon the latter to show that by the construction, maintenance and use of the reservoir he does not interfere with the rights of the prior appropriators.

With these principles in mind we proceed to examine the conditions presented by the record.

The owners of rights under the decree are the prior appropriators as against those who claim lake or reservoir rights. Two subsequent rights were allowed by the court in this case, that of Pozega for 100 inches in 1901, and defendant Johnson for 100 inches in 1904, but these two do not complicate the situation, although prior to some claimed reservoir rights.

It is incumbent upon the plaintiffs, then, who may be termed the lake users, to sustain the burden of showing that by the construction and maintenance of the reservoirs in the lakes, and by the use of the water impounded, they do not infringe upon the rights of the prior appropriators. It is conceded that the prior appropriators do not use the water from November 1 to April 1 of each year. The creek has many sources of supply other than the lakes in question, which furnish water for use between, as well as during, irrigating seasons. There has been little irrigation done in April. Generally there is a surplus of water at times during the month of June,—usually the high-water month in that locality. The exceptions to this general rule have been rare. During some years there is high

77 Mont.—16

water in May; during that month before a water commissioner assumes his duties upon the creek the ditch owners take all the water they can get regardless of the decree. (During three years only in the last twenty has a water commissioner been needed before June 1.) As a defendant testified, "the decreed users kind of divided the surplus water among themselves." There would be no objection to this practice if it did not work to the disadvantage of others.

That the waters of Race Track Creek coming through or from the lakes are subject to storage during the months of November, December, January, February and March is clear. There is nothing in the record to indicate that during the years the reservoirs have been in use there was ever any shortage in the creek for irrigating purposes during the month of April; on the contrary it is fairly inferable from the record that considerable water has gone to waste during that month each year.

Preliminary to examining the status of any of these reservoirs it is well to note that they have been operated pretty much as their owners saw fit to operate them. Some of the reservoir owners seem to have been considerate of the rights of prior appropriators, while others at times seem to have disregarded those rights. The decree of 1890 did not embrace the so-called lake rights, for the dams had not then been built. The testimony indicates that at times the rights of prior appropriators have been invaded by the lake users while at other times the normal flow in the creek has been increased by them to the benefit of the prior appropriators. If a reservoir user has invaded the rights of a prior appropriator it does not follow necessarily that his right to maintain and operate his [5] reservoir should be denied; although that result would follow were it made to appear that the construction and use of the reservoir necessarily will do so. The prior appropriators being entitled to the natural flow in the creek to the fullness of their respective needs (not exceeding the extent of their appropriations) and water having been impounded in

the lakes, how can the natural flow be ascertained? This really is the crux which confronted the lower court and now confronts us.

The plaintiffs have pleaded affirmatively that they are lake users, disclaim any right to the use of the normal flow of Race Track Creek, or any of its tributaries, as against the prior appropriators of the stream when the normal flow of the stream is needed by the prior appropriators; that the plaintiffs in addition to such creek rights as they may own, claim the right to use only such waters as they have impounded in their reservoirs; they claim to have stored surplus flood and waste waters only. They allege that they have permitted the natural flow to run down the stream in irrigating season and in addition have released stored water into the channel of the stream; they say they have released the natural flow and the stored flow at the outlet of each lake; and when reclaiming the water at the heads of their ditches they have made deductions "for seepage, evaporation and other losses." They do not deny the existence of the 1890 decree but admit it in all respects, including the amounts and priorities established by it, and admit all the decreed rights are prior to the reservoir rights. In effect they ask simply that their rights be adjudged valid with respect to the surplus flood and waste waters as impounded in the reservoirs which they have built and maintained.

At the threshold it is apparent that some of the lakes were [6] reservoired before the enactment of Chapter 185, "An Act to regulate the Appropriation of the Water in Streams in which the Rights therein have been adjudicated." (Session Laws of 1907, p. 489), and others after that time; some of those built before were enlarged after the enactment of that statute; and others initiated and enlarged after the enactment of Chapter 228, Laws of 1921, page 487.

First as to the effect of the 1907 Act. Counsel for defendants insist that the alleged appropriations of the plaintiffs, based upon reservoirs constructed after the enactment of Chap-

ter 185, *supra,* are invalid because confessedly the plaintiffs did not comply with the provisions of that Act. And counsel insist that the method provided thereby was an exclusive remedy. As was observed in *Anaconda National Bank* v. *Johnson, supra,* the statute of 1907 relating to the appropriation of water from adjudicated streams was designed to compel those who sought to appropriate water from such streams to become bound by the decrees which had been rendered with reference thereto. In that opinion we expressly reserved the question as to whether the method provided by that statute was intended to be exclusive.

By the first section of that Act it was declared that "all water hereafter appropriated by any person, association, company, or corporation after the passage of this Act, from any stream, creek, spring, canyon, river or ravine in this state, in which the water rights therein have been adjudicated and decreed prior to the passage of this Act, and a decree of a court of competent jurisdiction entered therein, shall be subject to such decree." (Sec. 1, Chap. 185, Laws of 1907, p. 489; sec. 4868, Rev. Codes 1907.)

The next section provided that in all streams, *etc.,* in which the water rights had not been adjudicated by a court of competent jurisdiction "water shall be appropriated in the same manner as provided by law at the time of the passage of this Act." (Now sec. 7129, Rev. Codes 1921.) And the next section had further reference to the effect of decrees which should be rendered thereafter. (Now sec. 7130, Rev. Codes 1921.)

Sections 4 to 9 inclusive (Session Laws 1907, pp. 490–493) provided the machinery whereby the person intending to appropriate water in any stream, *etc.,* wherein the rights to water therein have been adjudicated and decreed, should follow a certain course which was prescribed with some particularity. Then section 11 (Laws 1907, p. 493) provided: "A failure to comply with the provisions of this Act deprives the appro-

priator of the right to such decree, as against a subsequent claimant who complies therewith.'' Section 12 (Laws 1907, pp. 493, 494) specified the effect of the decree and provided for the jurisdiction by a water commissioner or water commissioners appointed by the court to distribute the water pursuant to the decree. Section 13 (Laws 1907, p. 498) provided that ''a failure to comply with the provisions of this Act deprives the appropriator of the right to use any water of such stream, as against any subsequent appropriator complying therewith, and as against any prior appropriator mentioned in or bound by a decree of court.''

The key to the interpretation of the question whether the Act was intended to be exclusive in its operation is furnished by sections 11 and 13. It is notable that the only penalty prescribed by these sections was that a failure to comply with the provisions of the Act simply operated to deprive the appropriator of the right to use any water of the stream as against any subsequent appropriator complying therewith and as against any prior appropriator mentioned in or bound by a decree of court. It is clear, then, that if there were no subsequent appropriator complying with the Act and if the person failing to comply with the Act did not trench upon the rights of prior appropriators under the decree, there was as to him no penalty for a noncompliance with its terms. It cannot be doubted that if an action were brought to again adjudicate the rights of persons taking water from an adjudicated stream—by no means a far-fetched supposition—the provisions of the former decree or decrees being conceded, and there being no subsequent appropriator complying with the terms of the Act, the court would, upon proper proof, confirm the rights to him who had diverted and made a beneficial use of waters of the stream in the order of his priority, even if he had not complied with the provisions of the statute.

In enacting the law the legislature did not intend to declare that one who failed to comply with the terms of the statute, but who, in the absence of any conflicting adverse right had nevertheless actually impounded, diverted, and put the water to a beneficial use, should acquire no title thereby. (*Murray* v. *Tingley,* 20 Mont. 260, 50 Pac. 723; *Bailey* v. *Tintinger,* 45 Mont. 154, 122 Pac. 575.)

It was well known to the profession that many able lawyers were doubtful of the constitutionality of the law by reason of the character of the notice to be given persons who might be adversely affected, as provided by section 5 of the Act. (Laws 1907, pp. 491, 492.) This was one of the reasons which caused the enactment of Chapter 228, Laws of 1921, in which it was manifestly the purpose, among other things, to cure that debatable feature of the Act of 1907, and to make that Act exclusive. (*Anaconda National Bank* v. *Johnson, supra.*) We are not called upon to determine whether the Act was constitutional in its mandate that all who should appropriate water from a stream after the rendition of a decree should be bound by the terms and provisions of the decree, for in this action that question is not pertinent. The plaintiffs have admitted the validity of the decree in all respects and have asked the court to bind them in accordance with the terms and provisions thereof; they are asking rights strictly in subordination thereto, and they are not confronted with the right of any person who has complied with the 1907 law.

Rights claimed by plaintiffs since the enactment of Chapter 228, Laws of 1921 (Session Laws, p. 487) are invalid upon the authority of *Anaconda National Bank* v. *Johnson, supra.* This, counsel for plaintiffs concedes in one part of the brief, but in another part he assumes to attack the constitutionality of the 1921 statute, basing his contention mainly upon the case of *Mays* v. *District Court,* 34 Idaho, 200, 200 Pac. 115, and other Idaho cases following the *Mays Case.* But by reason of the fact that the plaintiffs have conceded the

validity of the decree of 1890 they are not in any better position to attack the law of 1921 than they are that of 1907.

We shall now consider the conditions surrounding the construction, maintenance and use of the lakes.

Race Track Lake, claimed by plaintiff Donich: Vuscovich, a predecessor of Donich, had constructed a dam at the outlet of this lake probably before the year 1898. Donich purchased Vuscovich's lands and appurtenances in that year. When Donich was at the lake in August, 1901, the dam was about four feet in height, with water impounded to an elevation of three and a half feet above the natural level of the lake. This water he used that year by turning it into the creek, and reclaiming it by means of the Vuscovich ditch. In 1903 Donich built a new dam, on the site of the old at a cost of over $2,000. He testified that the new dam was about 120 feet long and ten feet high. Measurements made in September, 1923, by engineer Lee Williams show the dam to be 110 feet long, twelve feet thick, and ten feet three inches high. It is capable of storing water to a depth of six feet above the natural level of the lake. The acreage of the lake at present low-water level is 26.33 acres and when up to the spillway in the dam is 37.84 acres. It impounds 192.48 acre-feet of stored water, which engineer Williams said is equivalent roughly to a steady flow of 100 inches per twenty-four hours for thirty-eight days. Every year since building the dam, except two years when he was interfered with, Donich has stored water in this lake and has used the same for irrigating. Each spring the reservoir has been full and flowing over the spillway. That he needs the water is not questioned. This lake is fed, according to Williams, by six small streams; these he says could be measured to ascertain the inflow. On the other hand, engineer Kearney, a witness for the defendants, attempted to measure the inflow on July 2, 1924, and on account of the considerable quantities of seepage into the lake was unable to calculate the amount. He does not consider it possible to do so with reasonable accuracy.

Without considering the testimony in detail we think Donich is entitled to two reservoir rights in Race Track Lake, one at least as early as the year 1898 and the other in the fall of 1903. Donich's attempts to create a dam in Mud Lake, and to appropriate water thereby, have not been successful.

Pozega Lakes: John Pozega filed a notice of appropriation of water right on September 11, 1901, in which he claimed both creek and lake rights; he claimed five cubic feet per second, or 200 inches, continuous flow of the waters of Race Track Creek. In the notice he set forth that he had located and claimed Deep Lake for reservoir and storage purposes. It appears that in the fall of 1901 he built a dam across the outlet of Deep Lake to the height of six feet, and that he used water therefrom in 1902. In 1913 he raised the dam two feet higher, which made its height seven or seven and a half feet. And in 1921 the dam was raised to a height of eight and one-half feet. But Engineer Kearney testified the true height of the water level before spilling over the dam is 8.18 feet. Pozega also built a dam across the outlet of Pozega Lake No. 2 in the fall of 1901, sufficient to store water in that lake to a height of four feet. In 1913 it was increased to hold four and a half feet of water. He has stored water in these lakes each year and has used the same for irrigation except during the years when he was prevented from so doing by court proceedings. The water from Pozega Lake No. 2 flows into Deep Lake.

The area of the present low-water level of Deep Lake is 39.82 acres, and when water is impounded by the present dam, 48.07 acres. It impounds 376 acre-feet of stored water. Upon the basis of 100 inches flow per twenty-four hours it would require between seventy-five and seventy-six days to exhaust the amount indicated by that acreage. Pozega Lake No. 2 impounds 37.50 acre-feet which will supply a flow of 100 inches per twenty-four hours for between seven and eight days.

The evidence upon the point taken as a whole is convinc-. ing that the visible water flowing into Deep Lake may be measured with reasonable certainty. It is not difficult to determine the visible outflow. One witness testified he had seen open spots in the ice along the south and southwest shore of the lake which to him indicated springs beneath the surface of the lake. We do not regard this testimony as of much weight. If such springs do exist it should not be difficult to determine the normal flow by measuring the inflow and outflow of the lake after the resumption of the normal status following high water, taking into consideration the factor of evaporation, which will be adverted to hereafter. So far as we are apprised it is not difficult to ascertain the inflow and outflow of Pozega Lake No. 2. From Deep Lake, Pozega testified he released 125 inches and recaptured 112 inches. This was in addition to the normal flow. He allowed two feet of reservoired water for evaporation and seepage. It was his custom, he said, to leave from one to two feet of impounded water in the lakes when he ceased to use them for irrigation. On the other hand, there was testimony to the effect that Pozega had persisted in using the normal flow of the stream when prior appropriators had need for the water. Pozega also attempted to create a reservoir of Pozega Lake No. 3, but without success. No claim for this right is made upon this appeal.

Pozega is entitled to two rights in Deep Lake, one of August, 1901, and one of 1913; and the same in Pozega Lake No. 2.

Thornton Lake: The evidence indicates there was a dam at the outlet of this lake as early as the latter part of May or the first of June, 1883. In 1890 Gregor Schwend did some work upon it. Schwend in 1903 sued a neighbor for using reservoired water from the lake. In 1906 Schwend sold his land and ditches to Beal who in 1913 conveyed the property to W. M. Montgomery. On July 31, 1914, Mr. Montgomery had posted near the outlet of the lake a notice of

appropriation claiming Thornton Lake as a reservoir for the purpose of storing water to be used for irrigation. At that time the old dam would not hold water. It was torn out and in its place a dam costing $2,000 was built. It is a substantial dam capable of storing water to a height of 5.65 feet above the natural level of the lake, according to the testimony of engineer J. H. Schuch. Without entering into a discussion of the evidence it will be sufficient to say we think this right should bear date July 31, 1914.

It was the practice of the witness Bader who worked for Mr. Montgomery, to turn out from the lake 250 inches of water and to reclaim 200 inches at the head of the ditch in the valley. The plaintiff Heaphy who succeeded to the rights of Montgomery, in addition to the natural flow, has released 200 inches of water plus fifteen per cent for evaporation and shrinkage. The low-water area of the lake as computed by Mr. Schuch is 28.51 acres and the high-water area 33.04; 179.4 acre-feet of stored water is impounded. Computed into flowage at the rate of 100 inches per twenty-four hours it would take between thirty-five and thirty-six days to exhaust the amount stored. The witness Bader found the normal outflow of the lake before the dam was built to be between ten and fifteen inches. Each year before turning out the water Heaphy has measured the flow over the spillway, which would be "fifteen or twenty inches at the most." This testimony was not denied.

Engineer Kearney was unable to measure the water coming into the lake. That, he said, would be almost impossible to measure. Water seeps into the lake from different places down through large boulders and underneath moss.

Mountain Goat Lake: There was a dam in this lake about 1905, but whether it was completed and water was impounded in it for irrigation during that year the evidence does not disclose with any certainty. It has been used every year commencing with the year 1916. In that year the dam was six or seven feet high. In 1920 the dam was six feet high

[77 Mont. 229.]

and in that year it was increased to a height of ten feet and widened considerably. In 1921 it was increased a farther height of approximately two feet; it has cost between $6,000 and $7,000.

A witness whose qualification to testify does not seem to be questioned, says that the natural flow into the lake is about sixty inches, which does not vary much from year to year. This lake always is filled at a time when the prior users have plenty of water. As the witness explained, the thaw usually starts in the foothills and by the time it gets up to the lake there is plenty of water in the creek. "Any time it thaws up there it has thawed down ten or fifteen miles and there is plenty of water for everybody."

Engineer Kearney figured the volume of reservoired water in this lake to be 225.8 feet, based upon the natural level of the lake. At a flow of 100 inches per twenty-four hours, it would require a little over forty-five days to exhaust this amount of water.

A notice of appropriation, claiming water from this lake and claiming the lake as a site for a reservoir, with a right to construct a dam at the outlet thereof, was filed in the office of the county clerk of Powell county on September 4, 1902, but the evidence is not sufficient to apply to it the doctrine of relation back. It seems to us, after a careful consideration of the evidence, that the right must date from 1916 when the water was put to a beneficial use; and there is a further appropriation in 1920.

Bowman Lakes: The evidence respecting these fails to show that the plaintiffs Bowman, or their predecessor in interest, ever made any beneficial use of reservoired water prior to the year 1922. There is a failure of proof on their part all along the line. They have not attempted to comply with the 1921 law. Their alleged appropriations cannot be sustained.

In all of the lakes the time required for them to exhaust themselves at the rate of 100 inches per twenty-four hours, has been computed without reference to evaporation or seep-

age. With respect to seepage: As has been observed, all of these lakes, before the dams were placed therein, were natural lakes of considerable size. The seepage channels from these lakes, if any there are, were in existence when the plaintiffs and their predecessors erected the dams. Whether by raising the water the seepage will be increased is a matter of bare speculation. However, it seems to have been conceded by the litigants and their counsel that if there is any seepage from these lakes it finds its way eventually into the channel of Race Track Creek, undoubtedly above the heads of the ditches of the parties, which are many miles below the lakes. From the testimony in the case we cannot regard the problem of seepage as one of any particular consequence.

The conditions affecting evaporation are many. Generally [7] speaking, when evaporation is considered, the important variable influences are wind, air temperature and relative humidity. However, as an example, the evaporation from Race Track Lake at its normal surface of 26.33 acres would be increased when the water is standing at the top of the spillway just to the extent that the surface of the lake is then greater than 26.33 acres; the increased surface subject to evaporation would be 11.51 acres. In other words, there would be the same rule of evaporation per square yard from the lake when its surface is 34.84 acres as when its surface is 26.33 acres. In computing the amount of evaporation for which the plaintiffs should account, the acreage of the respective lake in its natural state should be deducted, for the defendants would lose that amount of evaporation in any event.

With respect to seepage and evaporation from the stream: It is of course apparent that the stream in its natural course daily soaks the course of its channel, and it gives off evaporation to the extent of the surface of the stream throughout its course. If water be turned in to an amount which substantially extends the perimeter of the channel of the stream, possibly a small allowance should be made for seepage; the evaporation will be increased only as the surface of the stream

is increased.   These, however, are engineering problems which may be determined with reasonable certainty.   As in other human problems, into which varying factors enter, it is not to be expected that results may be obtained with absolute mathematical accuracy.

Defendants at one place assert that the lakes have no reservoir capacity because of great seepage, and almost in the same breath say the lakes in question "are natural storage basins for the conservation of water during periods of high water so as to maintain the flow of the stream after the high water period each year has passed."

Mr. Kearney discussed the problem of the imperceptible inflow and outflow, or seepage from the lakes.   He concluded both conditions exist, and that taking the season through one would offset the other.   If there were any great fissures in the lake which would permit an underground flow the result would be that in the low periods of the year when there was not much inflow the lake would dry up by reason of the flow into the fissures.   It can safely be said, he remarked, that there are no fissures of that kind.

From the testimony in the record it appears satisfactorily [8]   that inflow and outflow of Deep Lake and Mountain Goat Lake may be ascertained.   And as to these, and any other where the inflow may be ascertained with reasonable certainty, the decree of the court should provide that suitable measuring devices shall be placed at the inlets and outlets of these respective lakes, so that the amount of the natural flow of the lakes may be released into the channel of Race Track Creek, or its tributaries, whenever prior appropriators may need the same.   Stored water should be permitted to run into the channel of the stream and be diverted therefrom, plus a reasonable amount for seepage and evaporation.

As to those lakes where it is not feasible to measure the in-[9]   flow a method was suggested by engineer Williams, who has had extensive experience, and to which the plaintiffs say they are willing to conform.   The suggested method is to

measure the natural flow from the lake when the reservoir is opened for use, requiring the reservoir owner to release that amount therefrom as the natural flow during all of the time the stored water is being withdrawn. This the engineer testified would compensate for all increases during the summer months in ordinary seasons. By this method, he said, the lake user would be surrendering to the prior appropriators more water than they would be entitled to, more than the natural flow. This appears reasonable, for it is common knowledge that after the subsidence of high water streams usually gradually decline until in the late fall, and the record indicates that is the case with Race Track Creek.

We think this plan is feasible if the natural flow of the lake is released at all times when required by the prior appropriators, even before the reservoir is opened for use—"opened for use" must mean when the reservoir owner begins to release water in addition to the natural flow. While the plaintiffs could not be compelled to follow the method suggested against their will they have invited the compulsion.

It is implied here that the reservoir has been filled with surplus flood or waste waters. Such being the case the amount flowing over the spillway, weather conditions being normal, would be the natural discharge of the reservoir. It would be more accurate to say, perhaps, that an addition to the amount flowing over the spillway should be released to supply loss in evaporation caused by the additional surface of the lake caused by the reservoir owner.

Another contingency is possible. It might happen that in [10] a winter when there is but little snowfall, followed by a dry spring, there would not be sufficient surplus waters to fill the reservoirs and that the prior appropriators would need the discharge from the lakes in order to carry on their irrigating in May and June. In that case the reservoir owners simply would be compelled to content themselves with such amounts of water as had been impounded during the winter months, being compelled to release the natural flow of the

reservoirs when called upon to do so. While the reservoir owners have been contenting themselves with the use of spillways, which are simply devices for safety, the contingency of being compelled to turn out the natural flow of the stream before the reservoirs are filled, presents an additional problem. This can be met by double compartment headgates; one compartment being constructed of removable stop-logs or flash-boards, and the other the ordinary gate. So that when called upon to release water below the spillway, the natural flow may be released over one compartment headgate and the rest of the water confined until required, plus water to compensate for evaporation as explained above.

The court found that the plaintiff John Pozega, prior to the commencement of the action, had cut down the natural rim of Deep Lake, Pozega Lake No. 2 and Pozega Lake No. 3, and plaintiff Heaphy had cut down the natural rim of Thornton Lake, and that the result of the cutting down of the natural rims of these lakes was and is to cause the same to be drained and to destroy their capacity as natural reservoirs for the conservation of the water supply. In so far as Pozega is concerned the finding is true but partially. Such cutting down as there was drained the lake only to the bottom of the cuts and the capacity of the lake as a natural reservoir for the conservation of water was cut down to that extent only. However, even if the rims of these lakes were cut down, the most the defendants could insist upon is that the water in the lake should never be lowered below the natural level of the lake. Pozega Lake No. 3 is out of the case. There is some evidence indicating that the rim of Deep Lake was cut, but the court did not determine the extent. From the testimony of engineer Kearney, who was well qualified to judge, the cut, if there was one, does not appear to have been great. The rim of Pozega Lake No. 2, however, appears to have been cut down 2.4 feet.

The evidence does not sustain the finding that Heaphy cut the rim of Thornton Lake and he must not be penalized

because someone not in privity with him did cut it. The cut was there before Montgomery built the dam. There is some positive testimony that the cut was made before Schwend built his dam. There is no direct testimony that Schwend or any one of his successors enlarged or deepened the cut.

The court found that neither the plaintiffs nor any of the defendants ever at any time determined or attempted to determine the amount of water naturally flowing out of the lakes, and that it is wholly impracticable and impossible to determine the amount of water flowing from the lakes or that hereafter will naturally flow therefrom under the various water conditions in the summer season, and that the defendants are entitled to all the water naturally flowing from the lakes and have the right to the use of all thereof whether in periods of high water or low water without being obstructed or interfered with, and that because of obstructions placed in the natural outlets of the lakes by plaintiffs and others, it is now and forever hereafter will be wholly impracticable and impossible to ascertain the amount of natural flow from the lakes. By reason of what has been said above we are unable to agree with the learned jurist who tried this case and deem this finding erroneous in several particulars.

In our judgment the evidence does not show that it is either impracticable or impossible to determine the amount of water flowing naturally from the lakes. It is but an engineering problem. It is not a fact that the defendants claiming under the decree are entitled to all the water naturally flowing from the lakes, whether in periods of high or low water, for the cogent reason that they are entitled to the water only to the extent of their needs, as before observed; they have not needed all of the natural flow of the stream in the month of April; many of them have not irrigated and do not irrigate in the month of May, and it is fairly inferable from the record that at times there would be more than sufficient water in the month of May to supply the needs of the defendants who desire to irrigate, if the water were distributed to those

who are entitled to use it and in the amounts to which they are entitled; there is surplus water at times in June each year; and it is undisputed that the defendants do not require any of the water of the lakes from November 1 to April 1.

The court also found that if the plaintiffs, or any of them, were permitted to use the lakes or any of them for the storage of water claimed to be waste or reservoired water, "the amount so stored could not be ascertained, and is not capable of ascertainment." This finding cannot be sustained. At the expense of reiteration it may be said that where the inflow and outflow of the lake may be measured with reasonable certainty the amount of stored water in the lake likewise may be computed with reasonable certainty. Where it is not possible to determine the amount of water coming into the lake the amount of stored water can be ascertained by computing the amount in the reservoir above the natural level of the lake. Where the reservoir is full the runover for all practical purposes may be deemed the natural flow. It may be necessary to calculate the extra evaporation which the increased surface of the lake causes, but as evaporation is taking place constantly, the amount at a given time is so slight comparatively as to provide but a slight error in computing the amount flowing out of the lake.

Considerable was said by counsel in argument respecting the impossibility of determining the rainfall. Of course, the amount of rainfall upon the surface of the lake is inconsequential. That which drains into the watershed of the lake during a rainfall is of consequence. Where the inflow and outflow are determinable, a rainfall in the watershed might increase the lake appreciably, though one witness testified, and there is no evidence to the contrary, that it would take an extremely heavy rain to raise the surface of the lake an inch. If the reservoir were full and discharging the normal flow over the spillway rain falling into the lake, and water from rain falling into it, would escape through the spillway. The falling of

rain after the opening of the lake by the lake user would be compensated, taking the remainder of the season through, by the determined amount the reservoir owner must release pursuant to the decree.

Much was said by counsel for defendants in the argument concerning the practical impossibility of reaching these lakes until well into June, but the record discloses that witnesses have been at these lakes as early as the middle of May and from then on throughout the month of June. However that may be, if the plaintiffs insist upon maintaining the reservoirs they must be prepared to release the water therefrom when the prior appropriators are needing the same. Furthermore, [11] unquestionably it will be necessary for the court to place upon the stream an additional water commissioner so that one water commissioner may regulate the division of the water between the persons entitled thereto in the valley and another, acting in conjunction with him, shall regulate the flow from the lakes. The plaintiffs say they are willing to be required to pay the cost of the additional water commissioner, and an order should be made accordingly. If it is necessary to install a telephone so the water commissioner in the valley may communicate with the water commissioner at the lakes, the plaintiffs should make provision therefor; and we understand this they are willing to do.

As to the pleadings we do not agree that plaintiffs' complaint does not state a cause of action.

The defendants alleged that the amount of water naturally flowing in Race Track Creek during the irrigating season never has been sufficient to supply their various appropriations, even when not interfered with. This allegation the plaintiffs admit in their reply, but neither side seems to have paid any further attention to it. Evidence was introduced by each side concerning the flow of the creek during irrigating season and respecting the necessity for water and the conduct of the parties in irrigating during the respective months, particularly in the month of May. The court found as a fact that

there was surplus water at times in the month of June. The evidence on these particular phases was admitted without objection and the pleadings should be considered amended to conform therewith. (*Ellinghouse* v. *Ajax Live Stock Co.,* 51 Mont. 275, L. R. A. 1916D, 836, 152 Pac. 481.) The testimony was admitted properly, with a commendable desire to learn all the facts surrounding the matters in controversy.

Defendants make the point that each enlargement of a reservoir amounts to a new appropriation. Conceding this to be correct the principle should not be held to cover repairs, no matter how substantial, if the reservoir thereby is not made to hold more than was originally contemplated as indicated by the acts of the appropriator.

It may be necessary for the court to take further testimony concerning the amount of water which should be allowed for seepage and evaporation. Likewise the court may desire additional testimony to enable it to determine the extent of the cut which plaintiff Pozega made in Deep Lake.

The cause is remanded to the district court with directions to set aside such findings and conclusions of law as are not in harmony with this opinion and to make others in lieu thereof, based upon the testimony already adduced in this cause and such other testimony as it shall receive in accordance with what is said in this opinion. The plaintiffs are entitled to recover their costs upon this appeal.

*Remanded with directions.*

ASSOCIATE JUSTICES GALEN, STARK and MATTHEWS and HONORABLE C. W. POMEROY, District Judge, sitting in place of MR. JUSTICE HOLLOWAY, absent on account of illness, concur.