No. 97-346

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 64

THOMAS D. AXTELL and
CARMEN D. AXTELL,

Plaintiffs and Respondents,

v.

M.S. CONSULTING, ET AL.,

Defendants and Appellants.

APPEAL FROM:   District Court of the Fifth Judicial District,
In and for the County of Madison,
The Honorable James E. Purcell, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

William A. Hritsco, Davis, Warren & Hritsco, Dillon, Montana

For Respondents:

W. G. Gilbert, III, Dillon, Montana; Robert C. Griffin, Herndon,
Sweeney &
Halverson, Billings, Montana (defendant Rowe)

Submitted on Briefs: October 9, 1997

Decided:   March 24, 1998
Filed:

_____

Clerk

Justice William E. Hunt, Sr., delivered the Opinion of the Court.

¶1    M.S. Consulting, et al. (M.S. Consulting) appeal from the summary judgment and decree entered by the Fifth Judicial District Court, Madison County, quieting title to certain water rights in favor of Thomas D. Axtell and Carmen D. Axtell (the Axtells).  We reverse and remand.

¶2    The following issue is dispositive of this case:

¶3    Did the District Court err in holding that no genuine issues of material fact existed and that summary judgment was proper?

BACKGROUND

¶4    M.S. Consulting is the owner of a 110-acre parcel of land located east of Sheridan, Montana in Madison County (hereinafter the "large parcel").  Within this large parcel lies a 2-acre parcel owned by the Axtells (hereinafter the "small parcel").  The Axtells own a house and operate a machine shop on the small parcel.  Eclipse Creek runs through both the large and small parcels.  Located on the large parcel, but beyond the perimeter of the small parcel are several springs.  Over the years, the Axtells and their predecessors in interest have used one of these springs for their domestic water needs.  It is the water rights to this spring which is the subject of the parties' dispute.

¶5    Prior to 1951, the large and small parcels were a single parcel owned by Nellie Clemo Duncan.  Ms. Duncan lived in a small house located east of Eclipse Creek on what is now the small parcel.  Ms. Duncan's granddaughter, Janet Kentfield (Kentfield), who lived with Ms. Duncan from 1936 until 1943, testified that her grandmother's house had no electricity or indoor plumbing, and that their water needs were met by going either to the spring on the large parcel, or to nearby Mill Creek, and packing home buckets of water every day.  It appears from the facts that the water from Eclipse Creek was not suitable for drinking. Kentfield testified that located west of Eclipse Creek, still on what is now the small parcel,

was another small cabin that her grandmother used for storage. When Ms. Duncan's house
burned down sometime after 1943, she fixed up the small storage cabin and moved there.
Kentfield testified that this second home likewise had no electricity or indoor plumbing.
Although Kentfield moved away in 1943, she visited her grandmother periodically. It was
Kentfield's belief that from 1943 until her grandmother's death in 1950, her grandmother
continued to have water packed from the spring or from Mill Creek to her home. Kentfield
testified that during the years she lived with and visited her grandmother, she never saw nor
was made aware of any pipes, spigots, or other devices carrying water from the spring to Ms.
Duncan's home.

¶6    Florence W. Baker was a close friend and neighbor who took care of Ms. Duncan.
Ms. Baker's daughter, Shirley McLaren (McLaren), testified that she assisted her mother in
taking care of Ms. Duncan by packing the water from either the spring or Mill Creek to the
house. McLaren testified that before she left the area in 1953, Ms. Duncan's water needs
were met by spring water which traveled from the spring via galvanized pipe to a spigot
located just outside the home.

¶7    On May 9, 1950, the elderly Ms. Duncan conveyed her property to Ms. Baker. Ms.
Duncan continued to live on the property until her death on August 10, 1950. Thereafter,
the house was vacant.

¶8    On June 15, 1951, Ms. Baker divided the property by conveying the large parcel to
H. H. Halse (Halse) and reserving the small parcel. The deed from Ms. Baker to Halse
conveyed the stated portion of land "[t]ogether with all and singular the tenements,
hereditaments, and appurtenances thereunto belonging or in anywise appertaining." The
deed made no mention of water rights. Ms. Baker owned the small parcel for the next ten
years and the house continued to remain vacant.

¶9    On September 6, 1961, Ms. Baker sold the small parcel to Milton and Marilyn Hunt
(the Hunts). The deed from Ms. Baker to the Hunts expressly conveyed "full right to all
water or water rights on said property." In 1962, the Hunts constructed a home on the small
parcel west of Eclipse Creek. Ms. Hunt testified that there were no sources other than
Eclipse Creek from which to supply their new home with water. Despite the

conveyance of water rights in their deed, the Hunts asked Halse for permission to use water from the spring on the large parcel. Halse agreed and permitted the Hunts to construct a water collection box at the spring and bury plastic water pipes from the spring to their home site. Ms. Hunt testified that during construction of the spring water conveyance system, she and her husband discovered no other buried pipes or evidence of a pre-existing water conveyance system which would have carried water from the spring to the small parcel. Ms. Hunt also stated that she used the former Nellie Clemo Duncan cabin for storage and that it had no indoor plumbing. She stated she never saw nor was she aware of any pipe or spigot conveying water to the cabin.

¶10  Ms. Hunt testified that after building the spring water conveyance system, she, her husband, and Halse entered into a signed, written 99-year lease of the spring water. However, neither party has been able to locate this lease. On December 17, 1963, Halse filed a Declaration of Vested Groundwater Rights for the "total flow of all springs" located on the large parcel.

¶11  In October, 1975, the Hunts sold the small parcel to Thomas Walter (Walter). Walter testified that he purchased the small parcel with a loan from the Veterans Administration who, before approving the loan, warned Walter that his spring water rights were not secure and that he may some day have to find another water source or drill a well. At the time, the large parcel, formerly owned by Halse, was now owned by Floyd Fossceco (Fossceco). Walter testified that he continued to use the spring water conveyance system that the Hunts had installed, and that Fossceco never made an issue of water rights.

¶12  Walter also testified that during his ownership of the small parcel, he buried a half-inch metal pipe across the small parcel, past the Duncan cabin, and up to the top of an adjacent mountain where a television antennae was located. Walter testified that within the pipe he inserted television cables and that he undertook this project to obtain better television reception at his house.

¶13  In June, 1984, Walter agreed to sell the small parcel to Ralph Hamler (Hamler). To

purchase the parcel, Hamler applied for a loan with the Farmer's Home Administration (FHA). The FHA would not approve the loan because the water supply to the house did not meet FHA specifications. For the loan to be approved, the FHA required Walter to drill a well and plumb the house accordingly. Walter complied with this request, and in so doing, installed a valve in the basement of the house so that one could easily alternate between using well water and spring water. Walter then sold the small parcel to Hamler.

¶14 On May 15, 1990, the Axtells purchased the small parcel. Soon thereafter, the Axtells demolished the former Nellie Clemo Duncan cabin, burned it, and discovered remnants of old half-inch galvanized pipe that had not burned. In 1991, the Axtells hired Joe Tezak (Tezak) to excavate a portion of their land for a machine shop they were planning to build for their business of manufacturing rifle sights and target rifles. During this excavation, Tezak discovered an old galvanized pipe approximately one and a half feet below the level at which the plastic water pipes had been buried. In 1992, the Axtells completed construction of the machine shop and plumbed it so that they could alternate between both well water and spring water. The Axtells mostly used spring water for their needs in the machine shop.

¶15 On December 10, 1993, the Axtells filed with the Montana Department of Natural Resources and Conservation a Notice of Water Right to "developed springs" with a diversion rate of sixteen gallons per minute. On the form, the Axtells indicated that they used the spring water for both domestic and livestock purposes.

¶16 On December 15, 1993, Fossceco sold the large parcel to M.S. Consulting. Fossceco represented to M.S. Consulting that the Axtells' use of spring water was by permission only. Immediately after closing on their purchase, M.S. Consulting filed a Notice of Water Right on all the springs located on the large parcel, unaware that the Axtells had filed their Notice of Water Right to the spring a few weeks earlier.

¶17 In August, 1995, M.S. Consulting excavated a pond and constructed a dam on the large parcel. During the excavation process, the Axtells' plastic spring water pipe was accidentally severed. The water pipe was temporarily fixed but left on top of the ground

pending completion of the dam. The Axtells requested M.S. Consulting to re-bury the pipes but M.S. Consulting refused. After several failed negotiations in trying to resolve the matter, M.S. Consulting gave the Axtells written notice that their water arrangement was terminated and that the Axtells' spring water supply would be cut off in forty-five days. On October 15, 1995, M.S. Consulting cut off the Axtells' spring water supply.

¶18 The Axtells responded by filing a complaint and obtaining an ex parte temporary restraining order (TRO) allowing them to re-connect the water line. A week later, a hearing was held on the matter of the TRO after which the District Court issued a temporary injunction enjoining M.S. Consulting from further interference with the Axtells' spring water supply.

¶19 On June 5, 1996, the Axtells moved for summary judgment. On October 30, 1996, after hearing oral argument on the matter, the District Court issued its Findings of Fact and Conclusions of Law. The court found that summary judgment was proper because no material issues of fact were in dispute. The court found that Ms. Duncan had obtained water from the spring on what is now the large parcel, via galvanized pipe, to a spigot outside her home on what is now the small parcel. The court concluded as a matter of law that when Ms. Baker divided her land, conveying the large parcel to Halse and reserving the small parcel, she necessarily reserved with the small parcel the appurtenant water right, even though she did not expressly reserve such water right in the deed. The court concluded that this water right was thereafter transferred to the Hunts, and through several mesne conveyances, to the Axtells. The court further concluded that the water right claimed by M.S. Consulting was later in time and subordinate to that of the Axtells. The court held that the Axtells were entitled to the use of all waters of the spring.

¶20 After receiving notice of judgment, M.S. Consulting filed a motion to quantify the Axtells' water right, but the motion was denied. M.S. Consulting then appealed to this Court.

STANDARD OF REVIEW

¶21 Our standard of review in appeals from summary judgment rulings is de novo. Mead v. M.S.B., Inc. (1994), 264 Mont. 465, 470, 872 P.2d 782, 785. When we review a

district court's grant of summary judgment, we apply the same evaluation, based on Rule 56, M.R.Civ.P., as the district court.  Bruner v. Yellowstone County (1995), 272 Mont. 261, 264, 900 P.2d 901, 903.  In Bruner, we set forth our inquiry:

The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist.  Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law.  We review the legal determinations made by a district court as to whether the court erred.

Bruner, 900 P.2d at 903 (citations omitted).

DISCUSSION

¶22  Did the District Court err in holding that no genuine issues of material fact existed and that summary judgment was proper?

¶23  In determining whether genuine issues of material fact exist in this case, it is necessary to first set out the legal framework in which water law issues are decided.  The following information was taken from Professor Emeritus Albert W. Stone's 1994 treatise Montana Water Law.  In Montana, prior to 1973, water rights were adjudicated according to the doctrine of prior appropriation.  Under this doctrine, a person could acquire an exclusive right to use a specific amount of water by applying it to the land for a beneficial use, or, in other words, "appropriating" the water.  Prior appropriations had priority over later appropriations.  Over time, as the number of appropriators claiming water rights in Montana increased, the adjudication of these rights became cumbersome and complex.  Finally, in 1973, the Montana Legislature passed the Water Use Act (the Act), abolishing the doctrine of prior appropriation and creating a new system of adjudicating water rights.  See Montana Water Use Act, 1973 Mont. Laws 452; Sections 85-2-212 to -907, MCA.  The Act mandated that all holders of existing claims to water rights in a particular water basin file with the Montana Department of Natural Resources and Conservation (DNRC).  Once existing claims were filed, the DNRC was to give each claim a priority date.  If any conflicts arose concerning the priority of claims, then such claims were to be inspected by the DNRC and adjudicated in a water court.  The Act provided that once existing water rights were adjudicated and filed according to a priority date, any new claims could arise only by the statutory method of filing, and, later filings would be subordinate to earlier ones.

¶24   Some water rights, including livestock and domestic uses of groundwater, are exempt
from the filing requirements of the Act.  Section 85-2-222, MCA.  However, regardless of
whether a water right is exempt from filing or not, the Act provides that once a water right
is filed, then the filing constitutes prima facie evidence of its content until the issuance of a
final decree.  Section 85-2-227, MCA.  At the present time, the process of water rights
adjudication under the Act is ongoing in Montana.

¶25   Although water rights adjudication today occurs in the framework of the Act, the Act
is not the only law that applies.  Because the Act recognizes existing water rights, pre-1973
law is still applicable in determining the existence and validity of water rights acquired
before 1973.  Much of the pre-1973 case law has been codified in the Montana Code
Annotated.  Because the water right at issue in this case spans a significant number of years
prior to 1973, we must apply pre-1973 law in determining the rights of the parties and in
determining whether there exist genuine issues of material fact making summary judgment
improper.

¶26   We turn then to the legal framework of the pre-1973 law.  As previously stated, under
the common law doctrine of prior appropriation, a person could acquire an exclusive right
to use a specific amount of water by applying it to the land for a beneficial use.
"Appropriate" means to "divert, impound, or withdraw . . . a quantity of water."
Section 85-2-102(1)(a), MCA. "Beneficial use" means "a use of water for the benefit of the appropriator
. . . including but not limited to agricultural (including stock water), domestic, . . . industrial,
irrigation, . . . and recreational uses."  Section 85-2-102(2)(a), MCA.  Appropriations, or "use
rights," have been recognized since the early pioneer days.  After numerous use rights had
accumulated on the waters in Montana, the Montana Legislature passed a law in 1885
providing that an appropriative water right could also be established by posting a Notice of
Water Right at the point of diversion and filing the notice with the county clerk.  See Dept.
of State Lands v. Pettibone (1985), 216 Mont. 361, 367, 702 P.2d 948, 951.  Regardless of
which method a person used to acquire a water right, common law or statutory, the
underlying rule was that earlier appropriations had priority over later ones.

¶27 Once a water right was acquired, it could be transferred. This is so even today under post-1973 law. Generally, a water right is appurtenant to the land where it is used, "and, as such, passes with the conveyance of the land . . . even though the grant does not specifically mention the water right." Maclay v. Missoula Irrigation Dist. (1921), 90 Mont. 344, 353, 3 P.2d 286, 290 see also Schwend v. Jones (1973), 163 Mont. 41, 44, 515 P.2d 89, 91. However, a water right may be severed from the land to which it is appurtenant by either of the following: (1) the grantor's conveyance of the land and express reservation of the water right, or (2) the grantor's conveyances of the land and water right separately. Maclay, 3 P.2d at 290. These rules are restated in  70-1-520, MCA, which provides that "[t]he transfer of a thing transfers also all its incidents unless expressly excepted, but the transfer of an incident to a thing does not transfer the thing itself." Once a water right is transferred, the new owner of the water right is prohibited from enlarging the water right beyond the original owner's use. Maclay, 3 P.2d at 290.

¶28 The division of a tract of land raises the additional question of how to quantify the water right appurtenant to each subdivision. In Bullerdick v. Hermsmeyer (1905), 32 Mont. 541, 553, 81 P. 334, 337 (overruled on other grounds), we held that two grantees who had acquired subdivided parcels of the grantor's land "each became vested with an interest in the water, measured in amount by the requirements in each case . . . ." Similarly, in Spaeth v. Emmett (1963), 142 Mont. 231, 237, 383 P.2d 812, 815 we held:

> [W]hen an owner of a tract of land with an appurtenant water right grants a portion of the tract without any express division or reservation, the appurtenant water right is divided in respective amounts to each tract measured in proportion as the number of acres irrigated with the water right on the land conveyed bears to the total number of acres irrigated by the water.

¶29 Once a person acquires a water right, either through appropriation or transfer, he must continue to use the water right for a beneficial purpose or risk losing the water right through abandonment. In Matter of Clark Fork River Drainage Area (1995), 274 Mont. 340, 344, 833 P.2d 1120, 1123, we recently stated the law of abandonment as it applies to water rights:

> Two elements are necessary for the abandonment of a water right: nonuse of the water associated with the water right and intent to abandon the water right.

>     [E]vidence of a long period of continuous nonuse of a water right raises a
>     rebuttable presumption of an intent to abandon that right and shifts the burden
>     of proof to the nonuser to explain the reasons for nonuse.  To rebut the
>     presumption of abandonment, there must be established some fact or condition
>     excusing the long period of nonuse, not mere expressions of hope or desire .
>     . . regarding future use of the water.

(citations omitted) (the court held that 23 years of nonuse of water rights was sufficient to
raise a rebuttable presumption of abandonment).  See also 79 Ranch, Inc. v. Pitsch (1983),
204 Mont. 426, 431, 666 P.2d 215, 217 (40 years); Holmstrom Land Co. v. Meagher County
Newlan Creek Water District (1980), 185 Mont. 409, 424, 605 P.2d 1060, 1069 (75 years);
Smith v. Hope Mining Co. (1896), 18 Mont. 432, 438-39, 45 P. 632, 634 (9 years).


¶30  Having set forth the applicable law regarding the acquisition, transfer, and possible
loss of water rights, we are prepared to apply the law to the facts of this case and determine
whether there exist any genuine issues of material fact.  We begin by tracing the water right
back to Nellie Clemo Duncan.

¶31  The record shows that Ms. Duncan held a valid water right to the spring in question
until May 9, 1950, the date she conveyed her property to Ms. Baker.  Ms. Duncan's
appropriation and beneficial use is evidenced by the testimony of Kentfield and McLaren
that they helped Ms. Duncan pack water from the spring to her home for her domestic needs.
Although the facts are in dispute as to whether Ms. Duncan later appropriated spring water
via galvanized pipe to a spigot outside her home, these facts are not material to the initial
question of whether Ms. Duncan possessed a valid water right.  In answering this question,
we look only to facts establishing Ms. Duncan's appropriation, not her method of appropriation.

¶32  On May 9, 1950, when Ms. Duncan conveyed the land to Ms. Baker, Ms. Baker
owned the water right because it passed with the land as an appurtenance.  Maclay, 3 P.2d
at 290.  The record shows that for the next three months, until Ms. Duncan's death on August
10, 1950, Ms. Baker continued to help Ms. Duncan meet her domestic water needs.  Thus,
it follows that Ms. Baker had a valid water right during this time because she continued to
apply the water to the land for a beneficial use.   Clark Fork, 833 P.2d at 1123.

¶33  After Ms. Duncan's death, Ms. Baker owned the entire tract of land for ten months during which the Duncan cabin was vacant.  Without citing to authority, M.S. Consulting argues that due to this period of vacancy, and apparent nonuse of the water right, there exists a factual dispute as to whether Ms. Baker possessed a valid water right at the time she divided her land.  It appears M.S. Consulting is making an argument of abandonment.  As previously stated, two elements must be shown to prove abandonment: nonuse of the water and intent to abandon the water right.  Clark Fork, 833 P.2d at 1123.  First, with regard to nonuse, we note that a mere vacancy of one's home does not necessarily mean that water is not being used.  Second, with regard to intent, evidence of a long period of continuous nonuse of a water right raises a rebuttable presumption of an intent to abandon.  Clark Fork, 833 P.2d at 1123.  The cases previously cited discussing the law of abandonment illustrate that ten months does not meet this Court's definition of a "long period of continuous nonuse."  In Montana, the shortest period of continuous nonuse raising a rebuttable presumption of abandonment is nine years.  Smith, 45 P. 632, 634.  Because M.S. Consulting cannot prove the elements of abandonment for this ten-month period, we conclude that Ms. Baker possessed a valid water right at the time she divided her land.

¶34  When Ms. Baker divided her land on June 15, 1951, conveying the large parcel to Halse and reserving the small parcel, an appurtenant water right passed with the conveyance to Halse, and an appurtenant water right remained with Ms. Baker, each in proportion to the extent of use beneficially applied to the land before the division.  Spaeth, 383 P.2d at 815. This is true even though Ms. Baker did not specifically reserve the water right with her reservation of the small parcel.  Maclay, 3 P.2d at 290.

¶35  Although Ms. Baker possessed a valid water right appurtenant to the small parcel she reserved, a question exists as to whether Ms. Baker thereafter lost this water right through abandonment.  M.S. Consulting asserts that because the Duncan cabin remained vacant during Ms. Baker's ownership of the small parcel, a period of eleven years, and because no water conveyance system existed on the small parcel during this period, Ms. Baker never used her water right.  M.S. Consulting argues that such nonuse resulted in Ms.

Baker's loss
of the water right.  Again, although M.S. Consulting did not explicitly mention abandonment
in its brief, it appears that abandonment is the argument M.S. Consulting intended to make.
In support of its position that no water conveyance system existed on the small parcel during
Ms. Baker's period of ownership, M.S. Consulting relies on the testimony of Kentfield, Ms.
Hunt, and Walter, that they had never seen and were never made aware of any metal pipes,
spigots, or other devices designed to carry water from the spring on the large parcel to the
cabin on the small parcel.

¶36  The Axtells do not dispute the vacancy of the Duncan cabin during Ms. Baker's
ownership of the small parcel.  However, the Axtells argue that Ms. Baker did not abandon
her water right because evidence in the record shows that a water conveyance system existed
during the period of Ms. Baker's ownership of the small parcel.  The Axtells point to
McLaren's testimony that in the last years of Ms. Duncan's life, her water needs were met
by a galvanized pipe carrying water from the spring to a spigot located outside her home.
Similarly, Joe Tezak testified that while excavating the small parcel for the Axtells, he
discovered galvanized pipe located one and one half feet below the plastic water pipes the
Hunts had buried.  Further, Mr. Axtell testified that galvanized pipe was discovered in the
rubble of the burned Duncan cabin.  M.S. Consulting purports to explain the existence of this
galvanized pipe by arguing that it is the same metal pipe buried by Thomas Walter to protect
his underground television cables.  However, M.S. Consulting has submitted no evidence
explaining why no television cables were found in the rubble with the galvanized pipe.

¶37  Having reviewed the record, we conclude that several issues of material fact exist with
respect to whether Ms. Baker abandoned her water right: whether a water conveyance system
existed during Ms. Baker's ownership of the small parcel; whether Ms. Baker failed to use
the water right; and whether Ms. Baker intended to abandon her water right.  These factual
disputes are material to the outcome of this case because if Ms. Baker did not abandon her
appurtenant water right to the small parcel, then the Hunts, and through mesne conveyances

the Axtells, would have acquired the appurtenant water right.  Maclay, 3 P.2d at 290; Section 70-1-520, MCA.  However, if Ms. Baker abandoned her water right, then no water right was ever available to pass with the conveyance of the small parcel to the Hunts and later to the Axtells.

¶38  M.S. Consulting  argues that the priority of water right filings, Halse's declaration of water right filed in 1963 and the Axtells' notice of water right filed in 1993, is another factual dispute material to this case.  We hold that this factual dispute is only material if Ms. Baker in fact abandoned her appurtenant water right.  If Ms. Baker abandoned her water right, then Halse's filing would be relevant and material in showing that Halse thereafter appropriated her former right, and owned all rights to the spring.  Otherwise, the filings are immaterial in deciding this case because the water rights at issue, livestock and domestic uses of groundwater, are exempt from the filing requirements of the Water Use Act.  Section 85-2-222, MCA.

¶39  Lastly, M.S. Consulting argues that the quantity of water used in connection with the water right is a genuine issue of material fact.  We agree, but only upon an initial finding that Ms. Baker did not abandon her water right.  If this is the case, and an appurtenant water right remained with Ms. Baker's reservation of the small parcel, then the Spaeth rule applies and the court must apportion the appurtenant water rights according to the extent of use beneficially applied to the land before the division.  Spaeth, 383 P.2d at 815.  The court must also apply the rule that successors in interest cannot enlarge a water right beyond that which was conveyed.  Maclay, 3 P.2d at 290.

¶40  Having discussed both the legal framework under which this case should be decided, and the factual disputes that are material to the outcome of this case, we hold that genuine issues of material fact exist and that summary judgment was improper.  The judgment of the District Court is reversed and this case is remanded to the District Court for further proceedings consistent with this opinion.

/S/  WILLIAM E. HUNT, SR.

We Concur:

/S/   JAMES C. NELSON
/S/   KARLA M. GRAY
/S/   W. WILLIAM LEAPHART
/S/   TERRY N. TRIEWEILER