JUSTICE RICE
concurring in part and dissenting in part.
¶48 The public right urged by the Commission would be based on the
fact that the public had used the creek as a fishing stream and natural fish hatchery before DuPuy built his dam. ... Such a public right has never been declared in the case law of this state.
Paradise Rainbows v. Fish and Game Commission (1966), 148 Mont. 412, 419, 421 P.2d 717, 721.
¶49 In this appeal, the DFWP is asserting a pre-1973 water right claim for fish, wildlife and recreation purposes for appropriations involving a diversion or capture of water. Although the Court’s rationale in Scare Lake properly recognized that recreational uses may constitute a beneficial use for purposes of applying the prior appropriation doctrine, the opinion unfortunately concluded that no appropriation right for recreational uses of any kind was recognized prior to 1973, except for those contemplated under the Murphy rights statute. That conclusion appeared to invalidate pre-1973 recreational claims which satisfied all of the elements of the appropriation doctrine, including the element of diversion.
¶50 I concur with the Court’s holding herein that recreational use is a beneficial use of water, and that the language in Bean Lake which purports to invalidate all pre-1973 recreational claims is erroneous. To the extent that it is necessary to clarify that pre-1973 recreational claims which meet all of the elements of the appropriation doctrine, including diversion, are valid, I concur with the Court’s decision herein. However, I must dissent from the remaining, substantial portion of the Court’s opinion. Bean Lake properly held that pre-1973 claims involving “non-captive,” i.e., instream or inlake, recreational uses have never been recognized, as also acknowledged by this Court *348 in Paradise Rainbows.
¶51 The Court offers a lengthy discussion in an effort to market its conclusions that the doctrine of prior appropriation is a “historically flexible” concept, and that the strict necessity of establishing diversion is mere “perception.” The Court further holds that the doctrine recognizes appropriations of water without a diversion whenever a diversion is not necessary for the use. Finally, the Court holds that pre-1973 instream appropriations have already been recognized and approved in our law. These conclusions, which blatantly ignore controlling statutes and case law, are all erroneous. A proper review of the applicable law establishes that diversion, or a form thereof, such as impoundment or capture, is a longstanding, foundational and requisite element for all pre-1973 water appropriation claims, including recreational uses. That the law clearly required it is an inescapable conclusion.
¶52 A brief look at our early history and precedent is necessary to accurately determine the applicable law on these issues.
¶53 This Court provided a detailed recounting of the early law of water appropriation in Bailey v. Tintinger (1912), 45 Mont. 154,122 P. 575. The Court noted the law had its origins in the customs of miners and others in California, and that those customs ripened into well-recognized rules long before the development of local government and legislation. “These customs formed a part of our unwritten law, or, as it might more aptly be termed, the common law of this country as distinguished from the common law of England.” Bailey, 45 Mont, at 166,122 P. at 579.
¶54 This pre-statutory common law of appropriation, often referred to in our case law as the “settlers’ customs,” was summarized by the Court in Murray v. Tingley (1897), 20 Mont. 260, 50 P. 723, as follows: “A person acquired a right to use the water by digging a ditch, tapping a stream, and turning water into it, and applying the water so diverted to a beneficial use. This constituted a valid appropriation of water.” Murray, 20 Mont, at 268, 50 P. at 725. Consequently, the Court reaffirmed therein that “[t]he essence of an appropriation [is] a completed ditch, actually diverting water, and putting it to a beneficial use ....” Murray, 20 Mont, at 269, 50 P. at 725. These common law requirements were repeatedly emphasized in our early case law and throughout our history.
¶55 Even at this early juncture in the discussion, the flaws in the Court’s analysis begin to appear. The Court holds that “beneficial use is the test of a valid right” and “beneficial use rather than diversion is *349 the touchstone of the prior appropriation doctrine,” but fails to acknowledge that diversion has always been an inherent requirement in our law’s assessment of whether water was beneficially used. As noted in the above quotations from Bailey and Murray, beneficial use has always been a separate, and additional, consideration which followed capture of the water itself. See also Wheat v. Cameron (1922), 64 Mont. 494, 501, 210 P. 761, 763 (“[ajctual diversion and beneficial use existing or in contemplation constitute an appropriation”). The Court further explained the difference between these two considerations in Toohey v. Campbell (1900), 24 Mont. 13, 60 P. 396, holding:
that right to the use of water is a possessory one, that may be obtained by actual appropriation and diversion, perfected by application of the water so appropriated to a beneficial use then present and contemplated.
Toohey, 24 Mont, at 17, 60 P. at 397. After explaining that the requirement of beneficial use “perfected” a diversion-based appropriation, the Court farther explained the process of determining beneficial use, which underscores another error in the Court’s opinion herein:
But, as every appropriation must be made for a beneficial or useful purpose ... it becomes the duty of the courts to try the question of the claimant’s intent by his acts and the circumstances surrounding his possession of the water, its actual or contemplated use and the purposes thereof.
Toohey, 24 Mont, at 18, 60 P. at 397. Contrary to the Court’s holding herein at ¶ 23, proof of intent is not, and has never been, a substitute for diversion. Rather, as the Court has previously explained, a claimant’s intent was analyzed to determine whether a beneficial use was contemplated, the amount of water appropriated, or if the right had been lost by abandonment of its beneficial use. In erroneously holding otherwise, the Court misapprehends Wheat v. Cameron, and cites it for the wrong proposition at ¶ 22. The Wheat Court, in holding that a claimant’s intent could be established “by his act and by surrounding circumstances, its actual and contemplated use, and the purpose thereof,” never wavered from also requiring “actual diversion,” in addition to intent. Wheat, 64 Mont, at 501, 201 P. at 762. Further, as we have clearly held, “[ajctual use was not a prerequisite to the creation of the right... actual diversion was enough, if with bona fide intent.” Bailey, 45 Mont, at 173, 122 P. at 582 (emphasis added), quoting Wiel on Water Rights. The intent, of course, was not an intent *350 to divert, but an intent to use the water beneficially.
¶56 This Court has explained that the concept of beneficial use developed in the law after the diversion requirement was already established. See In re Adjudication of Water Rights of Clark Fork River (1992), 254 Mont. 11, 15, 833 P.2d 1120, 1123. The concepts were then used together to define the extent of the right: ‘Water rights have therefore been limited to the amount of water actually put to a beneficial use, despite the amount of water diverted or claimed under a notice of appropriation.” 79 Ranch v. Pitsch (1983), 204 Mont. 426, 432, 666 P.2d 215, 218.
¶57 Even before statehood, the demands on water prompted the Montana Territorial Legislature to enact statutes governing the appropriation process. Legislation was first enacted in 1870 and revised in 1877. These provisions recognized water rights “acquired or to be acquired under the rules and customs of the early settlers,” and did not attempt to prescribe any other method of seeming water rights. Bailey, 45 Mont, at 166, 122 P. at 579. However, such an effort was undertaken by the enactment of “An Act relating to Water Rights” in 1885, legislation which this Court declared had ushered in a new era in water appropriation law. Commenting thereon, this Court stated:
[TJhere are, then, two distinct periods in the history of om water right law. The first comprises the time from the earliest settlement to 1885, during which period the rights were determined exclusively by the rules and customs of the settlers; and the second extends from 1885 to the present time.
Bailey, 45 Mont, at 167, 122 P. at 579. The Bailey Court extensively analyzed the legislation, finding that the Legislature’s “purpose was to prescribe the [five] steps necessary to be taken to effect a complete appropriation of water,” including: (1) posting notice, (2) filing notice with the county clerk and recorder, (3) commencing work within forty days of posting notice, (4) prosecuting the work with reasonable diligence, and (5) actual completion of the diversionary works. Bailey, 45 Mont, at 170, 173, 122 P. at 580, 581. The Comt emphasized the requirement of diversion under the statute, and, consistent with its explanation of beneficial use in Toohey, held that beneficial use could be established as a future intent, rather than concurrently established at the time of diversion:
[T]he claimant who proceeds under the statute, and performs the acts required as set forth above, has a completed appropriation of water upon the completion of the work on his ditch, canal, or other means of diversion, even before the water is actually applied *351 to beneficial use.
Bailey, 45 Mont, at 174, 122 P. at 582. The Court concluded that, following passage of the landmark legislation, water could be appropriated in two ways, either by way of the Act, or by the elements of the common law as existed prior to the 1885 enactment, but that both methods required a diversion or possession of water. Bailey, 45 Mont, at 174, 122 P. at 582.
¶58 That remained the law in Montana over the next century. Since 1885, Montana has had virtually the same statutory provisions governing water appropriation, and has continued to recognize diversion-based common law claims. The two methods, common law and statute, both requiring diversion, remained the only alternatives for seeming an appropriation of water. As we explained in Shammel v. Vogl (1964), 144 Mont. 354, 396 P.2d 103:
On March 12,1885, the statutory appropriation act was passed in Montana. Since 1885, two distinct methods of appropriating water exist. One is by complying with the rules and customs of the early settlers; consisting of actual appropriation and application to a beneficial use. The other is by complying with the terms of the statutes passed pursuant to the 1885 Act.
Shammel, 144 Mont, at 367, 396 P.2d at 110. This Court further held that the requirements of the appropriation statute will be “strictly construed,” and that a notice of appropriation thereunder is “fatally defective” to the claimed water right if it does not conform to statutory requirements. Holmstrom Land Company v. Meagher County (1979), 185 Mont. 409, 427, 605 P.2d 1060, 1070; Shammel, 144 Mont, at 369, 396 P.2d at 111.
¶59 The statutory scheme required that a notice of appropriation contain the following information, with the focus on diversion:
The quantity of water claimed designated in cubic feet or miner’s inches; the purpose for which the water is claimed and the place of intended use; the means of diversion, including size of ditch, etc., by which diversion will be made; the date of appropriation; the name of the appropriator; the name or description of the stream from which diversion is made; an accurate description of the point of diversion, with reference to some natural object or permanent monument; and, finally, the notice is to be verified by the affidavit of the appropriator or someone in his behalf, which affidavit must state that the matters and facts contained in the notice are true.
Section 89-810, R.C.M. (1947) (emphasis added).
*352 ¶60 In DNRC v. Intake Water Company (1976), 171 Mont. 416, 558 P.2d 1110, the Court analyzed the requirements for establishing a valid appropriation under the statutes. After setting forth the five statutory requirements enumerated above, the Court commented as follows:
Completion of all these steps is necessary to a complete appropriation [citation omitted]. A declaration of appropriation, unaccompanied by construction of a diversion works and actual diversion of the water, is insufficient [citation omitted]. Thus the posting and filing of the notice of appropriation is a condition precedent to a valid appropriation, and a valid appropriation does not exist without completion of the work and actual diversion of the water.
Intake, 171 Mont, at 430, 558 P.2d at 1118 (emphasis added). The Intake Court could not have been more clear, holding that (1) declaration of one’s intent to appropriate, without a diversion, does not establish a valid water right; and (2) a statutory appropriation is not valid without a diversion.
¶61 In reaching its conclusions today, the Court in large part ignores our century-old statutory scheme requiring diversion[1], preferring *353 instead to focus on our common law history. The Court finds that “the appropriation doctrine’s history of flexibility and practicality support a holding that a diversion is not required,” and that “beneficial use is the only essential element of a valid appropriation.” Finally, the Court concludes that “intent is the essential element and may be proven through means other than diversion.” In so holding, the Court refuses to honor our common law.
¶62 In Shammel v. Vogl, supra, after the Court concluded that the claimant’s right could not be established under the appropriation statutes, it analyzed her claim under the common law:
If the [claimant’s] water right exists, it will have to be shown as a water right acquired prior to the 1885 Act and without benefit of that Act. The essential features of an appropriation of water made prior to the 1885 Act are a completed ditch and actual appropriation and application of an amount of water to a beneficial use.
Shammel, 144 Mont, at 369, 396 P.2d at 111. The Court then found that the claimant’s failure to provide evidence of diversion was fatal, and affirmed the district court’s refusal to recognize the claim. This has been the unwavering position of the Court in regard to common law (non-statutory) water appropriations for a century. See Midkiff v. Kincheloe (1953), 127 Mont. 324, 328, 263 P.2d 976, 978 (“[t]he rule is that he who first diverts the water to a beneficial use has the prior right thereto where the right is based upon the custom and practice of the early settlers as here, and where there was no compliance with the statute”); Clausen v. Armington (1949), 123 Mont. 1, 212 P.2d 440 (“a person may make a valid appropriation of water by actual diversion and use thereof without filing a notice of appropriation as defined in sections 7100 to 7102, R. C. M. 1935”); Vidal v. Kensler (1935), 100 Mont. 592, 51 P.2d 235 (“a valid appropriation of water may be acquired even where there has been no compliance with the statute regulating appropriations by record, where the water is actually diverted from the stream and applied to a beneficial use; compliance is important only with regard to the doctrine of ‘relation back’ ”); Maynard v. Watkins (1918), 55 Mont. 54, 173 P. 551 (“[t]he essential elements of an appropriation were a completed ditch and the application of water through it to a beneficial use”).
¶63 Despite the heavy weight of our precedent, the majority finds that diversion was not a part of this Court’s “traditional appropriation analysis,” and that “[decisions from this Court have not consistently required diversions for water appropriations.” The cases cited for this *354 supposed “inconsistency” are Donich v. Johnson (1926), 77 Mont. 229, 250 P. 963, and Axtell v. M.S. Consulting, 1998 MT 64,288 Mont. 150, 955 P.2d 1362. However, neither stand for the proposition for which they are offered.
¶64 The issue in Donich was whether junior appropriators were infringing upon the water rights of senior appropriators, who claimed that the damming and storing of water by the junior rightholders was infringing upon their senior rights established under a previous adjudication. Donich dealt with the priority of rights between appropriators, not whether the junior appropriators’ actions fulfilled appropriation requirements. The existence of diversion was not an issue in the case, because diversion was acknowledged therein. The Donich Court stated that the actions of the junior appropriators constituted “diverting water,” and approved the junior appropriators’ capture and storage of the water for irrigation purposes:
The construction and maintenance of secure reservoirs for the conservation of these waters, therefore, is of very high public importance. ... The right to condemn land for a reservoir for the storing of water was declared in Helena Power Transmission Co. [citation omitted]. The right to impound and store water has been recognized repeatedly in other [Montana] opinions [citations omitted]. Indeed, the practice of impounding water in reservoirs has obtained in this state from the earliest days.
Donich, 77 Mont, at 239-40, 250 P. at 965. In supporting this kind of diversion, the Court stated that the use was permissible because “water appropriated may be turned into the channel of another stream, or from a reservoir into a stream and mingled with its waters and then reclaimed.”Donich, 77 Mont, at 240, 250 P. at 966. Although diversion was not an issue therein, Donich clearly approved of the physical •capture of water as the equivalent of diversion.
¶65 The Court then offers our 1998 decision in Axtell as an example of a common law non-diversion appropriation we have previously approved. As in Donich, Axtell did not address the necessity for diversion, but instead decided whether ownership of an existing right had passed to a successor in interest. The Court specifically stated that it was not addressing the “method of appropriation.” Axtell, ¶ 31. However, to the extent the issue can be analogized, it supports the diversion requirement. The Court first summarized pre-1973 water law in Montana, stating that:
As previously stated, under the common law doctrine of prior appropriation, a person could acquire an exclusive right to use a *355 specific amount of water by applying it to the land for a beneficial use. “Appropriate” means to “divert, impound, or withdraw ... a quantity of water .”
Axtell, ¶ 26 (emphasis added). In retracing the history of the water right in question, the Axtell Court found that the original rightholder would “pack water from the spring to her home for her domestic needs.” Axtell, ¶ 31. This “packing” of water, while not a diversion of the manner we normally think, is yet an equivalent physical capture which properly established the water right. Axtell thus rebels at the proposition for which it is offered.
¶66 Despite the capture of water involved in Donich and Axtell, and the recognition of diversion therein, the Court concludes from these two cases that “Montana has specifically recognized appropriations of water without diversions.”
¶67 Clearly, the Court is remaking the law, but more than that, it is rewriting history. Its holding does not simply pronounce a rule of law for future application. Rather, the holding declares the state of the law prior to 1973-that instream, non-diversion rights were then recognized. If that assessment of the law is correct, the Court should be able to cite to a Montana case which approved of such a pre-1973 right, but, of course, it is unable to do so. The only two cases which recognized pre-1973 recreational claims, Osnes Livestock Co. v. Warren (1936), 103 Mont. 284, 62 P.2d 206, and Paradise Rainbows v. Fish and Game Comm’n (1966), 148 Mont. 412, 421 P.2d 717, were based upon diversion. There are no other cases in our history to which the Court can cite in support of recreational claims-and certainly none which established a recreational right without diversion. In fact, every Montana case cited in the opinion stands precisely for the opposite conclusion than the one reached by the Court here.
¶68 The Court attempts to divert attention from the obvious lack of support in our precedent for its analysis by denouncing this dissent as a “simplified rendition of Montana’s water usage history.” If the Court deems this discussion of our law simplified, the objection lies not with the dissent, but with the law. Indeed, this Court has previously acknowledged the truth of the dissent’s central premise: “Such a public right has never been declared in the case law of this state.” Paradise Rainbows, 148 Mont, at 419, 421 P.2d at 721. While the Court claims to disdain fiction within legal analysis, its inability to point to a single Montana case supporting its position belies its asserted literary preference.
¶69 The Court also responds to this criticism by stating that *356 stockgrowers, loggers, and railroaders would be surprised to learn that the diversion requirement would have affected their water use, and that the Court “would have” approved of such uses, had it been given the opportunity. While I have not suggested, as the opinion states, that Montana law would not have recognized the withdrawal of water by stock as a water right, I respectfully suggest that it is our duty to apply the law as it exists, not the law that “might have been,” in seeking to explain the correct status of the law prior to 1973.
¶70 In an attempt to shore up its holding, the Court asserts that pre-1973 instream rights were recognized under the Public Trust Doctrine explained in Montana Coalition for Stream Access v. Curran. The Court fails to explain how Montana Coalition could have retroactively altered pre-1973 water law, noting simply that it magically “fills the void.” While it is undisputed that the public trust doctrine has long existed in our precedent,[2] the point missed is that the doctrine had never been interpreted or understood in our history as establishing an instream, non-diversionary right, because such an interpretation was inherently inconsistent with the known law of appropriation in Montana. Montana Coalition, while not directly addressing appropriative rights, did help to change the understanding of the public trust doctrine in 1984. Montana Coalition did not, however, change water law as it had existed prior to 1973. That is probably why none of the many parties who have appeared before the Court even cited Montana Coalition in its briefs. Montana Coalition simply did not do what the Court reads into it.
¶71 Complicating its error, the Court ignores a critical part of Montana Coalition. After the Court in Montana Coalition pronounced the general principle that “[t]he Constitution and the public trust doctrine do not permit a private party to interfere with the public’s right to recreational use of the surface of the State’s waters,” it *357 clarified that principle in regard to the party at issue: “Curran has no right to control the use of the surface waters of the Dearborn to the exclusion of the public except to the extent of his prior appropriation of part of the water for irrigation purposes...” Montana Coalition, 210 Mont, at 52, 682 P.2d at 170 (emphasis added).
¶72 The Court somehow overlooks that Montana Coalition held that, although Curran had no right to ownership of the riverbed or surface waters, his prior diversion-based irrigation right was superior to the public’s right, and he could properly restrict the public’s use to that extent. In its expansive re-write of pre-1973 water law, and its order for the Water Court to review all pre-1973 recreational, fish and wildlife claims, the Court apparently does not deem this part of the Montana Coalition holding significant enough to mention or to include in its instruction to the Water Court.
¶73 The Court then turns to State ex rel. Greely v. Confederated Salish and Kootenai to justify its recognition of pre-1973 instream rights, but misapplies that case. Although the Greely Court held that reserved federal and tribal rights could be adjudicated by the Water Court pursuant to the Montana Water Use Act, the substance of the opinion addresses the difficulties of so doing, given the considerable differences between reserved and state water rights.
¶74 The Greely Court acknowledged that “[t]he doctrine of reserved water rights conflicts with prior appropriation principles in several respects.” Greely, 219 Mont, at 90, 712 P.2d at 762. The Court explained that state water rights were apportioned on the basis of use, prioritized by time, defined by a specified quantity of water, required an actual, beneficial use of the water, and required that “an appropriator of a state-created right must divert, impound or withdraw water to appropriate.” Greely, 219 Mont, at 89, 712 P.2d 762.
¶75 The Court further explained that reserved rights were substantially different, in large part because, unlike state water rights, they were not based on use of the water. Rather, they were based upon the purposes of the reservation:
Appropriative rights are based on actual use. Appropriation for beneficial use is governed by state law. Reserved water rights are established by reference to the purposes of the reservation rather than to actual, present use of the water. The basis for an Indian reserved water right is the treaty, federal statute or executive order setting aside the reservation. Treaty interpretation and statutory construction are governed by federal Indian law.
Greely, 219 Mont, at 90, 712 P.2d at 762 (emphasis added). In *358 assessing whether the Water Use Act was capable of adjudicating reserved water rights, the Court first noted that the Legislature had enacted provisions governing reserved rights differently than state water rights. While the Act required a water right decree to state the place and means of diversion, § 85-2-234(5)(g), MCA, the Act had been revised to read that a decree “shall state ... the place and means of diversion, if any ...” for reserved rights. Section 85-2-234(6)(g), MCA. Likewise, provisions requiring a decree to describe the property to which the right was appurtenant, and the use to which water was being applied, were not required for reserved rights, contrasting the fundamental nature of these requirements for state water rights. Given these changes, the Court found the Act broad enough to adjudicate reserved rights, even though it noted that some provisions of the Act were irreconcilable with reserved rights, cautioning the Water Court “to not apply these code sections in an improper manner,” or otherwise inconsistently with federal law. Greely, 219 Mont, at 94, 712 P.2d at 765.
¶76 The Court begins its misapplication of Greely at ¶ 33:
In effect, the [Greely] Court, in determining what constitutes an “existing use,” incorporated the Water Use Act’s broad definition of “beneficial use” thereby making that definition applicable to both post and pre-1973 water right claims. Using the same t statutory definition for “beneficial use” as cited in Greely (a definition applicable to all water uses, not just tribes), there is no reason why the Water Court cannot adjudicate both tribal and non-tribal claims for instream uses prior to 1973.
From here, the Court then concludes that Greely can be cited as supporting Montana’s recognition of pre-1973 instream water rights. It is doubtful that anyone honestly reading Greely would give it such an interpretation. None of the many parties and amici before this Court cited it for such-and for good reasons. First, Greely addressed reserved rights only -state water rights were not before the Court. Secondly, the fact that the Act authorized the Water Court to adjudicate pre-1973 instream tribal water rights did not magically create and recognize pre-1973 instream state water rights. To the contrary, the Greely Court took great pains to differentiate these fundamentally different rights. The majority’s interpretation of Greely is utterly untenable.
¶77 Yet, from Greely and the three other cited cases, the Court finds at ¶ 34 that there is “confusion in our precedent” over the diversion requirement, and that it must “resolve the confusion in favor of the *359 Axtell, Donich, Montana Coalition and Greely line of authority.”[3] This means, according to the Court, that “because Montana has validated non-diversionary appropriations, we now hold that Montana law, prior to 1973 did not absolutely require a diversion for a valid appropriation of water.” The absoluteness of the Court’s error on the substance of the law cannot be overstated. There is as much “confusion” in our pre-1973 law on diversion as there is in a brick. Our law is simply monolithic. ¶78 This is acknowledged and explained in the brief of the DFWP, who is the Petitioner here:
[T]he general appropriation requirements of pre-July 1, 1973 Montana law...[required] an actual diversion (capture) and beneficial use of water to establish intent and to give other water users notice of the specifics of the appropriation. Diverting or capturing water for fish, wildlife or recreation is a beneficial use of water and establishes a valid right under pre-July 1, 1973 Montana law. Instream or inlake fish, wildlife and recreation claims that do not involve a diversion (capture) of water, except for Murphy Rights, as invalid under pre-July 1, 1973 Montana law.
¶79 The Court has now re-created pre-1973 water law in Montana. Its opinion is a smoothly written, seamless essay which attracts an unsuspecting reader to the conclusion that the holding is completely correct and justified under the law. Indeed, I cannot disagree with the proposition that “[c]ommon sense rebels against a rigid diversion requirement which would refuse to recognize an acknowledged beneficial use simply because application to the use does not require removal from the water source.” If this issue had been presented to the Court as a prospective revision to the common law properly arising out of litigation, I would most seriously consider it. However, the issue of instream rights is not even before the Court; only diversion-based claims are before us. The Court chooses to go outside the issues actually raised here, outside the arguments presented, outside the relief requested, and outside 100 plus years of precedent to retroactively redefine pre-1973 law. I submit that the Court is also *360 going outside its judicial obligation to apply the law that is, electing instead to remake pre-1973 law in accordance with what it wished the law had been.

 After ignoring the enduring history of these legislative enactments, and the repeated interpretation and application of the law by generations of Montana judges, the Court seizes upon the 1979 enactment of § 85-2-212, MCA, as evidence of the Legislature’s recognition of pre-1973 nondiversionary rights. The Court apparently concludes therefrom that these nondiversionary rights were superior to other water claims in that filing a claim was not even mandatory. At any rate, the Court has sorely misinterpreted this statute.
First, although this claim statute allowed voluntary filing of certain non-recreational instream claims, all claims were nonetheless required to prove “the place and means of diversion” in order to successfully establish the water right, § 85-2-234(6), MCA, and there was nothing inconsistent about this requirement. The statute, by its definition of “appropriation” (quoted herein), limited “instream” claims to those which were based upon “diversion, impoundment or withdrawal.” Section 85-2-102(1), MCA. Instream stock claims were deemed to be based upon withdrawal. Second, claims allowed under this statute were restricted to those with “existing rights,” which were defined by the statute as a water right “protected under the law as it existed prior to 1973.” Section 85-2-102(10), MCA. As demonstrated herein, no pre-1973 law protected instream recreational claims. Third, while the statute’s definition of “beneficial use” included recreational uses, the definition of “appropriation” nonetheless required those claims to he based upon diversion: “‘Appropriate’ means ... (a) to divert, impound, or withdraw (including by stock for stock water) a quantity of water.” Section 85-2-101(1)(a), MCA (emphasis added). In the case of the Department of Fish, Wildlife and Parks, the Petitioner here, appropriation was limited to leasing water under legislation adopted in 1989. Section 85-2-101(1)(c), MCA. Clearly, this 1979 claim statute did not alter the state of pre-1973 law, and the Court cannot point to any authority for such a conclusion. The Court also fails to explain how this statute’s provision for voluntary filing of diversion or withdrawal-based stock and individual claims recognizes non-diversionary recreational claims.

The Court reviewed these principles long before the 1972 Constitution was adopted. In Prentice v. McKay (1909), 38 Mont. 114, 98 P. 1081, we held that “the use of water is declared by the Constitution of this state ... to be a public use,” 38 Mont, at 117, 98 P. at 1083, citing Article III, Section 15, of the 1889 Constitution, and we again acknowledged this principle in Bailey, 45 Mont, at 175, 122 P. at 582. However, citing both federal and state statutes, the Prentice Court explained that, nonetheless, both “[t]he United States and the state of Montana have recognized the right of an individual to acquire the use of water by appropriation,” and have established procedures for doing so. Prentice, 38 Mont, at 117, 98 P. at 1083. These principles, adopted under the 1889 Constitution, were then incorporated into the 1972 Constitution, as specifically held by this Court in General Agriculture v. Moore (1975), 166 Mont. 510, 534 P.2d 859 (“[w]e construe Article IX, Section 3(1) of the 1972 Constitution as not only reaffirming the public policy of the 1889 Constitution but also as recognizing and confirming all [water] rights acquired under that Constitution and the implementing statutes thereunder”).

This “line of authority” is most interesting. The four referenced cases address very different issues, and none ofthemciteto any of the others. If the focus is diversion, then Donich and Axtell spoke approvingly of capture as a form of diversion, Montana Coalition acknowledged the superiority of diversion-based irrigation rights over the public’s right to use water pursuant to the Public Trust Doctrine, and Greely spoke of diversion approvingly in distinguishing state water rights from reserved rights. To the extent these cases provide any authority on the question here, it weighs against the Court’s position.